# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

***People v. Villa*, 2011 IL 110777**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VICTOR VILLA, Appellant. |
| Docket No. | 110777 |
| Filed | December 1, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The *Montgomery* rule's typical ban on use of juvenile adjudications to impeach a testifying defendant applied where a battery defendant, in testifying "I've never been in a situation like this before," was referring to his interviews with interrogators, rather than to his criminal history–no "opening of the door," and impeachment with juvenile burglary adjudication not harmless. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Boone County, the Hon. J. Todd Kennedy, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Thomas A. Lilien, Deputy Defender, and Paul J. Glaser, Assistant Deputy Defender, of the Office of the State Appellate Defender, of Elgin, for appellant. |
|---|---|
| | Lisa Madigan, Attorney General, of Springfield, and Michelle Courier, State's Attorney, of Belvidere (Michael A. Scodro, Solicitor General, and Michael M. Glick and Sheri L. Wong, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justice Freeman concurred in the judgment and opinion. |
| | Justice Burke specially concurred, with opinion. |
| | Justice Thomas dissented, with opinion, joined by Justices Garman and Karmeier. |

## OPINION

¶ 1 Defendant Victor Villa was convicted by a Boone County jury of aggravated battery with a firearm and aggravated discharge of a firearm under an accountability theory and was sentenced to concurrent terms of imprisonment of 14 years and five years, respectively. The appellate court affirmed the trial court. 403 Ill. App. 3d 309. The principal issue before this court is whether reversible error occurred when the State was allowed to impeach defendant, who testified at trial, with his prior juvenile adjudication for burglary.

¶ 2 We hold that a juvenile adjudication is typically not admissible against a testifying defendant, defendant did not "open the door" to admission of his juvenile adjudication, and the erroneous admission of defendant's juvenile adjudication was not harmless. Thus, we reverse and remand for a new trial.

¶ 3                                                    BACKGROUND

¶ 4 In October 2007, a Boone County grand jury indicted defendant on one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2006)), a Class X felony (720 ILCS 5/12-4.2(b) (West 2006)), and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)), a Class 1 felony (720 ILCS 5/24-1.2(b) (West 2006)). The charges stemmed from a drive-by shooting in Belvidere, Illinois, on August 8, 2007, during which one person was injured.

¶ 5 Prior to trial, defendant moved *in limine* to prohibit the State from introducing evidence regarding his August 2006 juvenile adjudication for burglary. In his written motion,

defendant argued that the probative value of such evidence was greatly outweighed by the danger of unfair prejudice. During argument, the State indicated that it sought to use the juvenile adjudication for impeachment should defendant testify. The following colloquy then took place:

> "THE COURT: Is there any case law that says you cannot use a juvenile delinquency finding for impeachment?
>
> [Assistant Public Defender] LEE: No. In fact, I believe the case law specifically says–
>
> THE COURT: (Interrupting) Says you can? So we're in the normal balancing.
>
> MR. LEE: Yes."

¶ 6 The trial court determined that the burglary adjudication, which was entered less than a year prior to the current offenses, related to defendant's truth and veracity and that its probative value outweighed any prejudice. The trial court thus denied defendant's *in limine* motion.

¶ 7 At trial, 17-year-old Adrian Cazares testified that on August 8, 2007, at 10 or 11 p.m., he and four friends–Hector, Capone, Poyo, and Casper–were driving around in Hector's car in the Belvidere neighborhood where defendant lived. Capone threw a water bottle out the car window at Joe Follis, a friend of defendant, nearly knocking Follis off of his bicycle. Capone exited the car and chased Follis on foot. Cazares testified that he spotted defendant on the sidewalk and told his companions "it was just going to be me and him." The group exited the car and "everybody started getting rowdy." Defendant had a "tube," later identified as a ceremonial knife with a sheath. Cazares and defendant "started going at it," and Cazares admitted kicking and hitting defendant numerous times. Cazares was adjudicated a delinquent minor for aggravated battery in connection with this incident.

¶ 8 After the fight, Cazares and his companions retreated to Cazares's house, which was two blocks away, and remained outside in the driveway. Also present was Cazares's uncle, Luis Perez. Cazares and Perez both testified that they watched a vehicle slowly approach the house, and then come to a complete stop in front of the driveway. One of the passenger windows rolled down and multiple shots were fired from inside the vehicle toward the house. Cazares described the vehicle as a black SUV with tinted windows.

¶ 9 Perez further testified that the first bullet that was fired hit the trunk of his vehicle, and the second bullet hit the back of his arm and exited through his chest and shoulder, lodging in his shirt. Police recovered the bullet which hit Perez, and also recovered two spent rounds that hit Cazares's house. All three rounds were .30/.32 caliber and were fired from the same firearm, probably a revolver. A fourth round went into the attic of Cazares's house and was not recovered. The following day police located a vehicle that matched the description of the vehicle from which the shots were fired. The vehicle was parked in the driveway at the home of defendant's friend, Angel Hernandez.

¶ 10 Several weeks later, on September 26, 2007, defendant learned that police were looking for him. Defendant voluntarily went to the Belvidere public safety building, where police arrested him. The following morning, Detectives Woody and Wallace spoke with defendant. After being advised of his *Miranda* rights, defendant, who had just turned 18 three weeks

earlier, gave police an oral statement, which Detective Woody transcribed verbatim on a computer. Defendant reviewed and signed the statement. In this statement, which was read to the jury, defendant provided the following description of the events leading up to the shooting:

> "On the 8th of August like 9:30 at night I was outside talking on the phone to my girl and I seen a dude passes by on a bike a car pass by after him. All I heard was 'whats up nigga'. I heard a bottle smash on the ground. I thought the dude on the bike was my boy Joe so I went into my house to get my knife and ran out there. I got into the street and I got surrounded. I swung my knife and at the same time I got hit in the mouth. Some guy pulled me down and started beating the shit out of me. I had lumps and bruises on my head and face and elbows. I couldn't do anything and they kept hitting and kicking me. I got up and they started running down the street toward some white dude's house. The car that dropped them off was in the parking lot. The car started driving up the street toward Logan so I ran and that's when I seen Joe. I asked him, 'what the fuck dude where were you?' Joe looked at the car and put his hand under his shirt and said, 'should I blast them.' I told him no. I called Angel on my cell phone and I told him that I got my ass whooped. Angel said, 'Alright I'll be through there.' Angel drove his mom's or sister's black SUV and parked into the parking lot. He got there he asked if I was alright. I showed him my arms and head. Angel said, 'Let's ride around.' We got into the car and I noticed Angel's girlfriend was in the front passenger seat. We drove toward Adrian's house. It was dead silence until we got by Adrian's house and we started slowing down. My window rolled down and I saw a bunch of cars and people in the front of the house. I told Joe, 'Get them Nigga's'. Angel said, 'Yeah, get them Nigga's'. Joe was sitting behind the driver and got close to me then pointed his hand out the window and shot multiple times. We took off to Joe's house and Angel dropped me and Joe there."

¶ 11    In a subsequent question and answer session that was also transcribed, defendant clarified that "Joe" was Joe Follis, "Angel" was Angel Hernandez, and "get them niggas" meant "Blast them." Defendant also clarified that he first noticed that Follis had a gun as they were driving to Cazares's house. Defendant described the gun as a black revolver. When asked by police why defendant, Follis, and Hernandez went to find Cazares, defendant stated, "I was really mad; I wanted to fuck them up." The following questions and answers were also transcribed as part of defendant's statement:

> "Q. Why are you telling us this today?
>
> A. Because it's the truth and I want the best outcome for me and my mom.
>
> Q. Is there anything in your statement you want to add or delete from your statement?
>
> A. I'm sorry about this man. I wished it had never happened. I wish I would've listened to my mom and stayed in my house that night."

¶ 12    Defendant testified on his own behalf, stating that only part of the statement he gave to police was true. According to defendant, the only reason he called Hernandez was to drive Follis home, whom defendant believed might be in danger. Upon arriving, Hernandez told

defendant to forget about the fight. Hernandez's girlfriend was sitting in the front passenger seat, and defendant and Follis got into the backseat of the car. Follis was seated behind Hernandez. Defendant testified that Follis told Hernandez to drive down the street, which was in the direction of Cazares's house. As they approached the house, Follis told Hernandez to slow down. Defendant testified, "when we got right in front of the house, Joe [Follis] rolled down the window and just pulled out a gun and started shooting." Defendant testified that everyone in the car was scared and surprised, defendant "didn't expect that to happen," and he was "mad" at Follis. Defendant denied seeing the gun at any time before the shooting and denied telling Follis to "get them niggas."

¶ 13 Defendant also testified that he initially told Detectives Woody and Wallace that he did not tell Follis to shoot anyone, but the detectives said they did not believe him. According to defendant, he was scared and "started throwing some things in" to make his story more believable. When asked on direct examination why he would sign a statement that contained false information, defendant answered:

> "I don't know. You know, I honestly didn't know what to say. I was scared. You know, I just–all I can say is I was scared. I've never been in a situation like this before. You know. I gave–I gave them that statement because, you know, they were saying that I was looking at prison time and stuff like that. I've never been in prison or nothing like that."

¶ 14 On cross-examination, the State challenged defendant's testimony that he had "never been in a situation like this before." Defendant admitted that on January 19, 2006, he had been interviewed by the same detectives at the Belvidere police department on another case and had given a typewritten statement in that case. Defendant insisted that the two situations were "nowhere near the same," and on redirect explained that in 2006 he was 16 years old and was questioned as a juvenile. In contrast, when he was questioned by police in 2007, he had already turned himself in to police, and he had been arrested and charged as an adult with aggravated battery with a firearm.

¶ 15 In rebuttal, the State published a certified copy of defendant's juvenile adjudication for burglary, entered on August 28, 2006. The State referred to the juvenile adjudication twice during its closing argument and twice more during rebuttal argument, generally asserting that the burglary adjudication was a basis for concluding that defendant's trial testimony was not truthful.

¶ 16 The jury was instructed on the legal theory of accountability and returned a verdict finding defendant guilty of both charged offenses–aggravated battery with a firearm and aggravated discharge of a firearm. In his motion for a new trial, defendant argued, *inter alia*, that the trial court erred "in allowing the State to present to the jury evidence of defendant's juvenile adjudication." Defendant did not elaborate further in his written motion. During argument on the motion, defense counsel did not assert, as he did in the motion *in limine*, that the prejudice to defendant of admitting his juvenile adjudication outweighed its probative value. Rather, defense counsel argued for the first time that under *People v. Montgomery*, 47 Ill. 2d 510 (1971), a juvenile adjudication is not admissible against a testifying defendant. The trial court agreed with the State that this was a new argument, but

that defendant's juvenile adjudication was admissible pursuant to statute–an apparent reference to section 5-150(1)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/5-150(1)(c) (West 2006)). The trial court denied defendant's motion and subsequently sentenced him to concurrent terms of 14 years' imprisonment for the aggravated battery with a firearm and 5 years' imprisonment for the aggravated discharge of a firearm. The trial court also ordered defendant to pay Luis Perez $20,083 in restitution.

¶ 17    Defendant appealed, arguing that the trial court erred by allowing the State to impeach him with his juvenile adjudication or, in the alternative, that trial counsel rendered ineffective assistance by failing to proffer a proper objection to that evidence. The appellate court rejected defendant's arguments and affirmed his conviction and sentence. 403 Ill. App. 3d 309. The appellate court held that, pursuant to section 5-150(1)(c) of the Juvenile Court Act of 1987, a juvenile adjudication may be admitted against a testifying defendant for impeachment purposes, subject to the balancing test set forth in *Montgomery*, and that defendant's juvenile adjudication was properly admitted. *Id.* at 317. The appellate court further held that defendant's juvenile adjudication was admissible for the independent reason that defendant opened the door to its use. *Id.* at 318. Finally, the appellate court held that trial counsel's arguments concerning the juvenile adjudication cannot form the basis of an ineffective assistance of counsel claim because defendant's own testimony provided a basis for admission of the juvenile adjudication. *Id.* at 321.

¶ 18    We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).


¶ 19                                ANALYSIS
¶ 20                                   I
¶ 21    Defendant argues that, pursuant to the holding in *Montgomery*, a juvenile adjudication is not admissible against a testifying defendant, and he was denied a fair trial when the State was permitted to impeach him with his juvenile adjudication. Though defendant first raised this issue posttrial, the State does not argue that defendant has forfeited review or acquiesced in the admission of his juvenile adjudication. Thus, the State has forfeited these arguments. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) ("State may forfeit an argument that the defendant forfeited an issue"). In addition, defendant renews his appellate argument that trial counsel was ineffective by failing to appreciate the "full implication of *Montgomery*" and wrongly conceding prior to trial that case law supported the admission of defendant's juvenile adjudication. Thus, the impeachment issue is squarely before us.

¶ 22    Resolution of this issue requires us to consider the relationship between this court's decision in *Montgomery* and section 5-150(1)(c) of the Juvenile Court Act of 1987, both of which speak to the admissibility of juvenile adjudications in criminal proceedings. We review this legal issue, which devolves into an issue of statutory construction, *de novo*. *People v. Alcozer*, 241 Ill. 2d 248, 254 (2011).

## II

The Juvenile Court Act, as adopted in 1965, prohibited the admission of a juvenile adjudication against the minor "for any purpose whatever in any civil, criminal or other cause or proceeding except in subsequent proceedings under this Act concerning the same minor." 1965 Ill. Laws 2585, 2590 (§ 2-9); Ill. Rev. Stat. 1965, ch. 37, ¶ 702-9(1). This statutory provision was still in effect in 1971 when this court decided the *Montgomery* case.

In *Montgomery*, this court adopted then-proposed Federal Rule of Evidence 609. Under this rule, the credibility of a witness may be attacked with evidence of a prior conviction where the crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or a false statement, regardless of the punishment. In either instance, however, such evidence is inadmissible where the trial judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice or, generally speaking, the prior conviction is more than 10 years old. *Montgomery*, 47 Ill. 2d at 516.

Relevant to this appeal, proposed Rule 609 also addressed the admissibility of juvenile adjudications, stating:

> " 'Evidence of juvenile adjudications is generally not admissible under this rule. The judge may, however, allow evidence of a juvenile adjudication of a witness *other than the accused* if conviction of the offense would be admissible to attack the credibility of an adult and the judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.' " (Emphasis added.) *Id.* at 517 (quoting 51 F.R.D. 391).

Although the *Montgomery* case did not involve a juvenile adjudication, this court intended that all provisions of proposed Rule 609 should be followed in future cases. *People v. Ray*, 54 Ill. 2d 377, 383 (1973).

In 1982, the legislature amended the Juvenile Court Act and rewrote the provision concerning the admissibility of juvenile adjudications in other proceedings. The amended statute provided, in pertinent part, that juvenile adjudications "shall be admissible *** in criminal proceedings in which anyone who has been adjudicated delinquent *** is to be a witness, and then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials." Pub. Act 82-973 (eff. Sept. 8, 1982); Ill. Rev. Stat. 1983, ch. 37, ¶ 702-10(1)(c).

In *People v. Massie*, 137 Ill. App. 3d 723 (1985), our appellate court discussed the interplay between this provision and the *Montgomery* decision. The appellate court held that a plain reading of the statute indicates that juvenile adjudications are only admissible where the person "is to be a witness," and that the statute contains no language indicating that the provision applies where a defendant testifies on his own behalf. The appellate court noted that a contrary interpretation would conflict with *Montgomery*. *Massie*, 137 Ill. App. 3d at 731. The appellate court also held that because the statute provides that a juvenile adjudication is only admissible "pursuant to the rules of evidence for criminal trials," admissibility must be in accordance with *Montgomery*, which adopted the rule of evidence governing the use of juvenile adjudications in criminal proceedings. *Id.* See also *People v.*

*Bunch*, 159 Ill. App. 3d 494, 513 (1987) (acknowledging that under *Montgomery* and *Massie* juvenile adjudications are not admissible for impeachment against a testifying defendant); *People v. Allen*, 151 Ill. App. 3d 391, 394 (1986) (stating that under *Montgomery* and *Massie* defense counsel's advice to defendant not to testify because the State would impeach him with his juvenile adjudications was incorrect).

¶ 29    When the legislature adopted the Juvenile Court Act of 1987 (Act), the provision restricting the admission of juvenile adjudications remained the same. Pub. Act 85-601 (eff. Jan. 1, 1988); Ill. Rev. Stat. 1987, ch. 37, ¶ 801-10(1)(c). Accordingly, our appellate court continued to construe the statutory prohibition on the admission of juvenile adjudications in concert with *Montgomery*, as the appellate court had done in the *Massie* opinion. *People v. Kerns*, 229 Ill. App. 3d 938, 941 (1992) (following *Massie*); see also *People v. Sneed*, 274 Ill. App. 3d 287, 295 (1995) (stating that the court has no discretion to admit a juvenile adjudication against a testifying defendant, citing proposed Federal Rule of Evidence 609(d), as adopted in *Montgomery*, and *Kerns*).

¶ 30    The statute was next amended as part of the Juvenile Justice Reform Provisions of 1998. Pub. Act 90-590 (eff. Jan. 1, 1999). The amended provision is identical to the prior provision, with one addition. The amended provision states that juvenile adjudications "shall be admissible *** in criminal proceedings in which anyone who has been adjudicated delinquent *** is to be a witness *including the minor or defendant if he or she testifies*, and then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials." (Emphasis added.) Pub. Act 90-590 (§ 2001-10) (eff. Jan. 1, 1999). This statute was in effect at the time of defendant's trial in this case and has not been amended further. See 705 ILCS 405/5-150(1)(c) (West 2010).

¶ 31    A split of authority has occurred in the appellate court as to whether juvenile adjudications are admissible for impeachment against a testifying defendant, as section 5-150(1)(c) seems to suggest, or inadmissible, as *Montgomery* instructs. In *People v. Coleman*, 399 Ill. App. 3d 1150 (2010), the Fourth District reconciled section 5-150(1)(c) of the Act with *Montgomery* and held that juvenile adjudications are normally not admissible against a testifying defendant. *Coleman*, 399 Ill. App. 3d at 1155-56. In the present case, the Second District parted company with *Coleman* and essentially held that the statute trumps *Montgomery*. 403 Ill. App. 3d at 316-18. The Fourth District has had an opportunity to consider the appellate opinion under review and has adhered to its earlier decision in *Coleman*. See *People v. Bond*, 405 Ill. App. 3d 499, 506-12 (2010), petition for leave to appeal pending, No. 111504.

¶ 32    Before addressing this conflict in the case law, we make two preliminary observations. We observe first that the holding of *Montgomery* relating to juvenile adjudications has now been codified as Rule 609(d) of the Illinois Rules of Evidence (Ill. R. Evid. 609(d) (eff. Jan. 1, 2011)). We need not consider the effect, if any, of this codification because it postdates defendant's trial by over two years. Moreover, the comment to Rule 609 expressly states that the codification of the *Montgomery* holding was not intended to resolve any conflict between *Montgomery* and section 5-150(1)(c) of the Act. Ill. R. Evid. 609, cmt. (eff. Jan. 1, 2011); see also Ill. R. Evid. Committee Commentary (eff. Jan. 1, 2011) (recognizing a possible conflict between Rule 609(d) and section 5-150(1)(c) of the Act and stating that codification

"is not intended to resolve the issue concerning the effect of the statute").

¶ 33    We observe also that defendant does not dispute the State's contention that the General Assembly had the authority, when it amended the Act in 1998, to enact a new rule of evidence governing the admissibility of juvenile adjudications. We need not consider the legislature's authority in this area because, as discussed below, section 5-150(1)(c) is not in conflict with the rule of evidence adopted in *Montgomery*.

¶ 34    Defendant argues that if the legislature intended to break from the *Montgomery* rule, it would have removed or modified the statutory language, "pursuant to the rules of evidence for criminal trials," which Illinois courts have interpreted as a nod to *Montgomery*. The State counters that the legislature, by adding the language "including the minor or defendant if he or she testifies," meant to remove the prohibition, adopted in *Montgomery*, against admission of juvenile adjudications to impeach a testifying defendant and to expressly permit this practice.

¶ 35    Our primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *People v. Smith*, 236 Ill. 2d 162, 167 (2010); *People v. Williams*, 235 Ill. 2d 286, 290 (2009). "We determine intent by reading the statute as a whole and considering all relevant parts." *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 403 (2005). Words and phrases should not be considered in isolation. *People v. Santiago*, 236 Ill. 2d 417, 428 (2010). Accordingly, in construing section 5-150(1)(c) of the Act, we cannot focus exclusively on the limiting language on which defendant relies, nor on the amendatory language on which the State relies. To the extent these portions of section 5-150(1)(c) appear to conflict, we must, if possible, construe them in harmony. See *In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 499 (2001). Although an amendment to a statute may give rise to a presumption that the legislature intended to change the law (*Williams v. Staples*, 208 Ill. 2d 480, 496 (2004)), such presumption is not conclusive and may be overcome by other circumstances and considerations (*Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 461 (1995); 1A Norman J. Singer & J.D. Shambie Singer, Sutherland on Statutory Construction § 22:30, at 360-61 (7th ed. 2009)).

¶ 36    Notably, when section 5-150(1)(c) was amended in 1998, Illinois courts had already examined the statutory phrase "pursuant to the rules of evidence for criminal trials." *Massie* and subsequent cases interpreted this phrase to mean: pursuant to the *Montgomery* decision, which adopted the rule of evidence applicable to juvenile adjudications. *Massie*, 137 Ill. App. 3d at 731; *Allen*, 151 Ill. App. 3d at 394; *Bunch*, 159 Ill. App. 3d at 512; *Kerns*, 229 Ill. App. 3d at 941; *Sneed*, 274 Ill. App. 3d at 295. The legislature chose to retain this language, without modification, when it amended section 5-150(1)(c). Where, as here, statutory language has acquired a settled meaning through judicial construction and that language is retained in a subsequent amendment of the statute, such language is to be understood and interpreted in the same way unless a contrary legislative intent is clearly shown. *In re Marriage of O'Neill*, 138 Ill. 2d 487, 495 (1990); *People v. Agnew*, 105 Ill. 2d 275, 280 (1985). This is so because the judicial construction of the statute becomes a part of the law, and the legislature is presumed to act with full knowledge of the prevailing case law and the judicial construction of the words in the prior enactment. *R.D. Masonry*, 215 Ill. 2d at 404;

*People v. De La Paz*, 204 Ill. 2d 426, 433 (2003). We conclude, therefore, that when the legislature amended section 5-150(1)(c) in 1998, it intended the phrase "pursuant to the rules of evidence for criminal trials" to continue to have the same meaning it had for well over a decade.

¶ 37 The State argues that interpreting this portion of section 5-150(1)(c) in this way renders meaningless the very language added to the statute by the 1998 amendment. We are mindful of our duty to construe this statute so that each clause is given effect (see *DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 509-10 (2006)) and reject the State's argument. The previous versions of the statute had been interpreted as barring the use of juvenile adjudications for impeachment of a testifying defendant. See, *e.g.*, *Massie*, 137 Ill. App. 3d at 731; *Kerns*, 229 Ill. App. 3d at 941. The pertinent language added by the 1998 amendment simply removed that statutory bar. Compare Ill. Rev. Stat. 1987, ch. 37, ¶ 801-10(1)(c), with 705 ILCS 405/5-150(1)(c) (West 2010). "In other words, the legislature has said a defendant who chooses to testify may be impeached with a juvenile adjudication but has conditioned the use of such impeachment on the rules of evidence for criminal trials." *Coleman*, 399 Ill. App. 3d at 1155.

¶ 38 The fact that the legislation simultaneously permits juvenile adjudications to be used against a testifying defendant, but also restricts such use pursuant to the rules of evidence as adopted in *Montgomery*, does not render the new language meaningless. At the time the amendment was adopted, case law had already recognized an exception to *Montgomery* permitting introduction of a defendant's otherwise inadmissible criminal record where the defendant "opens the door." *Bunch*, 159 Ill. App. 3d at 513; *People v. Brown*, 61 Ill. App. 3d 180, 184 (1978). Accord *People v. Harris*, 231 Ill. 2d 582, 590-91 (2008) (holding that defendant opened the door to admission of his juvenile adjudication). The amendatory language simply recognizes that circumstances may exist where a juvenile adjudication is admissible against a testifying defendant, notwithstanding the general prohibition against the admission of such evidence under *Montgomery*.

¶ 39 The State also argues that the legislature intended to put juvenile adjudications on the same footing as criminal convictions for impeachment purposes. The State cites the Juvenile Justice Reform Provisions of 1998 as a whole, noting that this court has recognized a "shift from 'the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law.' " *People v. Taylor*, 221 Ill. 2d 157, 172 (2006) (quoting *In re A.G.*, 195 Ill. 2d 313, 317 (2001)). The State maintains that allowing juvenile adjudications to impeach a testifying defendant is consistent with this shift in purpose.

¶ 40 Although juvenile proceedings and criminal trials share a number of common features, significant differences still exist between the two. *Taylor*, 221 Ill. 2d at 170. Further, the shift in goal set forth in the Juvenile Justice Reform Provisions of 1998 has not negated the concept that rehabilitation is a more important consideration in juvenile proceedings than in criminal trials. *Id.* This court, therefore, has been reluctant to equate a juvenile proceeding under the Act with a criminal trial. *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006). As we stated in *Taylor*, " 'the ideal of separate treatment of children is still worth pursuing.' " *Taylor*, 221 Ill. 2d at 170 (quoting *McKeiver v. Pennsylvania*, 403 U.S. 528, 546 n.6 (1971) (plurality op.)). Thus, we reject the State's argument that juvenile adjudications should be put on an

-10-

equal footing with criminal convictions for impeachment purposes.

¶ 41    For the foregoing reasons, we hold that section 5-150(1)(c) of the Act allows the admission of juvenile adjudications against a testifying defendant for impeachment only in accordance with *Montgomery* and its progeny. We therefore overrule the appellate decision under review to the extent it holds that section 5-150(1)(c) changed the rule adopted in *Montgomery*.

¶ 42                                                    III

¶ 43    Our holding above does not absolutely resolve whether defendant's juvenile adjudication should have been admitted. The appellate court concluded that, irrespective of its interpretation of section 5-150(1)(c), defendant's juvenile adjudication was admissible because defendant opened the door to its use when he testified that he had "never been in a situation like this before" and had "never been in prison or nothing like that." See 403 Ill. App. 3d at 313. Defendant urges reversal of the appellate court.

¶ 44    Although evidentiary rulings are typically left to the sound discretion of the trial court (*People v. Jackson*, 232 Ill. 2d 246, 265 (2009)), the issue here is whether the appellate court correctly held, as a matter of law, that defendant opened the door to the admission of his juvenile adjudication. On this purely legal issue our review proceeds *de novo*. See *People v. Smith*, 233 Ill. 2d 1, 15 (2009).

¶ 45    In ruling that defendant had opened the door to admission of his juvenile adjudication, the appellate court relied on this court's opinion in *People v. Harris*, 231 Ill. 2d 582 (2008). In *Harris*, the defendant, when asked on direct examination whether he had committed the crimes in question, testified:

> " 'No sir. There is no possible way that I could have committed this crime. I mean people who commit robberies, things like that, have a motive, have a reason for doing things like that. But I am a professional man. I work. I go to college. I went to Robert Morris, ICC, Midstate. I mean, it's no reason–I mean I live a productive life. I live just like any of the 12 jurors, like you live. *I don't commit crimes.*' " (Emphasis added.) *Harris*, 231 Ill. 2d at 584-85.

The trial court allowed the State to impeach defendant with evidence of his two most recent juvenile adjudications. In judging whether the trial court had abused its discretion, we determined that the "pivotal question" on review was whether the defendant was attempting to mislead the jury about his criminal background when he testified, "I don't commit crimes." *Id.* at 590. "If he was, then he 'opened the door' and the trial court was well within its discretion to allow the admission of defendant's prior adjudications for purposes of impeachment. If he was not, then defendant's testimony was not a proper basis for the admission of that evidence." *Id.*

¶ 46    The defendant in *Harris* maintained that his answer was merely a present tense statement of how he conducts his life and was not meant to misstate or falsify his juvenile record. We concluded that even if true, "it is just as reasonable to construe defendant's answer as a comprehensive denial of *ever* having engaged in criminal activity, which amounts to an outright lie." (Emphasis in original.) *Id.* at 591. Thus, we found the trial court did not abuse

its discretion when it permitted the State to impeach the defendant with two prior juvenile adjudications. *Id.*

¶ 47     Defendant argues that *Harris* is distinguishable from the present case. Defendant notes that in *Harris* the State did not seek to introduce the defendant's juvenile adjudications until after he had testified. In the instant case, however, the decision to allow the use of defendant's juvenile adjudication for impeachment was made prior to the start of trial when the court denied defendant's motion *in limine*. Defendant thus contends that the "the door was already opened" when he took the stand. We disagree.

¶ 48     The trial court's pretrial ruling, permitting the State to introduce evidence of defendant's juvenile adjudication, is not tantamount to the independent act of a defendant opening the door to admission of such evidence. To be sure, defendant's juvenile adjudication was going to be revealed to the jury regardless of the substance of his testimony. But the issue is whether defendant's testimony provided an alternative basis for admission of the adjudication on which we may sustain the trial court's ruling. See 2A Ill. L. & Prac. *Appeal & Error* § 403 (2002) ("The reasons a court gives for admitting or excluding evidence are not material, for purposes of appellate review, if there is a proper basis appearing in the record or law that will sustain the ruling."); *People v. Johnson*, 208 Ill. 2d 118, 128-29 (2003) (discussing the fundamental principle of appellate law that permits affirmance of a lower court's order on an alternative ground).

¶ 49     We note that this is not a case where the defendant touched on his criminal background on direct examination in response to an adverse *in limine* ruling in order to " 'blunt the impact' of the State's anticipated evidence." *People v. Hanson*, 238 Ill. 2d 74, 100 (2010) (quoting *People v. Brown*, 172 Ill. 2d 1, 48 (1996)). In such a case, the defendant cannot be said to have opened the door to admission of a juvenile adjudication. Here, the relevant portion of defendant's testimony was given in response to questions seeking an explanation as to why defendant would sign an inculpatory statement that contained false information. On that issue, defendant testified on direct examination:

> "I don't know. You know, I honestly didn't know what to say. I was scared. You know, I just–all I can say is I was scared. *I've never been in a situation like this before*. You know. I gave–I gave them that statement because, you know, they were saying that I was looking at prison time and stuff like that. *I've never been in prison or nothing like that*." (Emphases added.)

The pivotal question is whether defendant was attempting to mislead the jury about his criminal background. See *Harris*, 231 Ill. 2d at 590.

¶ 50     The State argues that defendant's testimony falsely implied that he had no experience with the criminal justice system, thus opening the door to admission of his juvenile adjudication. We do not find the State's broad construction of defendant's testimony to be a reasonable one. When read in context, defendant's testimony that he had "never been in a situation like this before" plainly refers to his interrogation by Detectives Wallace and Woody. This testimony, at most, implied that defendant had never before been questioned by police. Police questioning may occur in numerous circumstances and is not necessarily indicative of a criminal background. Thus, defendant's testimony simply opened the door to

cross-examination by the State regarding instances of prior police questioning; it did not open the door to defendant's prior criminal history.

¶ 51    We note that the State did attempt to impeach defendant by cross-examining him about his interrogation by the same detectives in connection with another case 18 months earlier; defendant denied that the two police encounters were similar. On redirect examination, defendant explained why the two police encounters were different. Notably, defendant never strayed from the narrow subject of police interrogation and, accordingly, did not open the door to admission of this juvenile adjudication.

¶ 52    The result does not change when we consider defendant's additional testimony that he had "never been in prison or nothing like that." The State concedes that defendant had never been imprisoned. Thus, this portion of defendant's testimony was truthful. The additional phrase, "or nothing like that," cannot be reasonably construed as opening the door beyond the narrow subject of prior police interrogations.

¶ 53    We note, also, that defendant's testimony here stands in stark contrast to the defendant's testimony in *Harris* that "I don't commit crimes." Although a defendant's testimony need not be as direct as the testimony in *Harris* in order to open the door to admission of a prior juvenile adjudication, something more is needed than a reference to prior police questioning, as occurred in this case. We emphasize that permitting the State to introduce a juvenile adjudication where the defendant opens the door is an exception to the rule set forth in *Montgomery* prohibiting the admission of juvenile adjudications against a testifying defendant. Courts must exercise caution when applying this exception and determining the extent to which a defendant has opened the door.

¶ 54    We hold that defendant's testimony does not provide an alternative basis for affirming the trial court's ruling allowing the State to introduce into evidence defendant's prior juvenile adjudication for burglary. The admission of this evidence was error.

¶ 55    The State argues that even if defendant had not been impeached with his juvenile adjudication, no reasonable probability exists that he would have been acquitted of the charged offenses. We disagree.

¶ 56    The only evidence in this case implicating defendant in the drive-by shooting was his statement to police. Although Adrian Cezaras testified regarding the earlier assault on defendant, thus supplying a motive for the shooting, no other witness testified as to defendant's involvement. No witness placed defendant in the vehicle from which the shots were fired, and no witness testified that defendant gave the order to shoot. The State's case rested on defendant's statement, and the prosecutor's ability to persuade the jury that defendant was not credible when, at trial, he testified that the inculpatory portions of his statement were false. Thus, defendant's credibility figured prominently in the State's case.

¶ 57    Significantly, during the State's relatively short closing argument, the prosecutor twice referenced defendant's prior juvenile adjudication. The prosecutor first stated that the jury should take into account his "burglary adjudication *** in determining his truthfulness." The prosecutor then added: "And I submit to you he is less truthful because of his burglary adjudication." A short time later, the prosecutor again referenced defendant's juvenile adjudication, stating: "[I]f he gets over the bias for being on trial and the fact that he's got

-13-

a burglary adjudication, then you would have to believe that the defendant somehow made *** some of these things up." In the State's rebuttal argument, the prosecutor again argued that the jury "can certainly determine that because [defendant] has a juvenile adjudication for burglary that he's not telling the truth." The State reiterated this point when the prosecutor argued that the jury should "factor in the juvenile burglary adjudication with all the other evidence, and that's just another thing that tells you when this defendant testified today he was not telling you the truth."

¶ 58    Based on the lack of evidence implicating defendant in the drive-by shooting other than his own statement which he recanted, in part, at trial; the role the jury's credibility determination necessarily played in defendant's conviction; and the State's repeated argument that defendant's juvenile adjudication was a basis to find his in-court testimony untruthful, we conclude that the evidentiary error in this case was not harmless. Accordingly, we reverse and remand for a new trial.

¶ 59    In light of our disposition, we need not consider defendant's additional argument that trial counsel was ineffective for failing to lodge the appropriate objection to the admission of defendant's juvenile adjudication.

¶ 60                                    CONCLUSION

¶ 61    For the reasons stated, we hold that the admission into evidence of defendant's juvenile adjudication was error, and such error was not harmless. We reverse the judgments of the circuit and appellate courts and remand to the circuit court for a new trial.

¶ 62    Reversed and remanded.

¶ 63    JUSTICE BURKE, specially concurring:

¶ 64    I fully concur and join in the majority opinion in this case. I write separately only to explain why I believe Justice Thomas is incorrect in his interpretation of section 5-150(1)(c) of the Juvenile Court Act.

¶ 65    Justice Thomas interprets section 5-150(1)(c) as authorizing the admission of a testifying defendant's prior juvenile adjudications for impeachment purposes. Such an interpretation, however, is in direct conflict with the long-standing rule adopted by this court in *People v. Montgomery*, 47 Ill. 2d 510, 517 (1971). As we recently and unanimously stated in Illinois Rule of Evidence 101, which is a codification of our common law, when a statute conflicts with a rule or decision of this court, the Illinois Supreme Court has the last word under separation of powers principles. See Ill. R. Evid. 101 (eff. January 1, 2011) ("[A] statutory rule of evidence is effective unless in conflict with a rule or decision of the Illinois Supreme Court."). Thus, Justice Thomas' interpretation would render the statute unconstitutional in violation of separation of powers. See Ill. Const. 1970, art. II, § 1 (the legislative, executive, and judicial branches of government are separate and "[n]o branch shall exercise powers properly belonging to another"); *People v. Bond*, 405 Ill. App. 3d 499, 507-08 (2010).

¶ 66    Unconstitutional interpretations should be avoided. In *People v. Williams*, 143 Ill. 2d 477,

482-83 (1991), we held that although a judicial rule will prevail over a statute that directly and irreconcilably conflicts with that rule on a matter within the court's authority, this court will attempt "to reconcile most conflicts between rules of the judiciary and legislative enactments." See, *e.g.*, *People v. Harris*, 231 Ill. 2d 582, 591 (2008) (wherein we declined to interpret section 5-150(1)(c) but, instead, created an exception to our *Montgomery* rule, allowing impeachment of a testifying defendant with his prior juvenile adjudications where the defendant "opened the door" by providing misleading testimony concerning his prior criminal history). Here, the majority offers an interpretation of section 5-150(1)(c) that avoids the constitutional problem by reconciling any perceived conflict. Moreover, the majority's interpretation upholds our long-standing *Montgomery* rule, which not only has been applied by our trial courts for decades, but also is now incorporated in our newly adopted rules of evidence. Accordingly, I join with the majority.

¶ 67    JUSTICE THOMAS, dissenting:

¶ 68    In the first half of its decision, the majority concludes that section 5-150(1)(c) does not permit the use of prior juvenile adjudications as impeachment evidence against a testifying defendant. In the second half of its decision, the majority concludes that defendant's testimony in this case did not open the door to the admission of his prior adjudications for purposes of impeachment. Because I disagree with both of these conclusions, I must respectfully dissent.

¶ 69                                  Section 5-150(1)(c)

¶ 70    Although the majority fully and accurately recounts the history of section 5-150(1)(c), it is worth taking the time to review that history again. When originally adopted in 1965, the Juvenile Court Act prohibited the admission of a prior adjudication "for any purpose whatever in any *** proceeding." Ill. Rev. Stat. 1965, ch. 37, ¶ 702-9(1). Six years later, in *Montgomery*, this court adopted then-proposed Federal Rule of Evidence 609, which addressed the use of prior criminal convictions for purposes of impeachment. As a general rule, *Montgomery* provides that a witness's prior conviction is admissible for impeachment purposes only where (1) the crime was punishable by death or imprisonment of more than one year, or the crime involved dishonesty or a false statement; (2) the conviction is less than 10 years old; and (3) the trial judge determines that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. *Montgomery* then explained that, while evidence of a prior adjudication is generally *not* admissible for impeachment purposes, a trial judge may allow such evidence in relation to a witness *other than the accused*, and only where (1) such evidence would be admissible to attack the credibility of an adult and (2) the judge is satisfied that the admission of such evidence is necessary for a fair determination of guilt or innocence. *Id.* at 517.

¶ 71    In 1982, the legislature amended the Juvenile Court Act, which, *Montgomery* notwithstanding, had continued to prohibit the admission of prior adjudications "for any purpose whatever in any *** proceeding." See Ill. Rev. Stat. 1981, ch. 37, ¶ 702-9(1). Once amended, the Act authorized the admission of prior adjudications "in criminal proceedings

in which anyone who has been adjudicated delinquent *** is to be a witness, and then only for purposes of impeachment and pursuant to the rules of evidence." Ill. Rev. Stat. 1983, ch. 37, ¶ 702-10(1)(c). The uniform understanding of this provision was that (1) while prior adjudications were now admissible for purposes of impeaching a "witness," they remained inadmissible in relation to a testifying defendant; and (2) to be admissible against a witness, prior adjudications had to satisfy the admissibility standards set forth in *Montgomery*. See, *e.g.*, *Massie*, 137 Ill. App. 3d at 731; *Bunch*, 159 Ill. App. 3d at 513; *Allen*, 151 Ill. App. 3d at 394.

¶ 72    And so things remained until 1998, when the legislature "radically altered" the Juvenile Court Act "to provide more accountability for the criminal acts of juveniles and *** to make the juvenile delinquency adjudicatory process look more criminal in nature." *People v. Taylor*, 221 Ill. 2d 157, 165 (2006) (describing Public Act 90-590). Among the many radical alterations contained in Public Act 90-590 was an amendment to the provision governing the use of prior adjudications for impeachment. Again, since *Montgomery* was decided in 1971, the clear state of the law in Illinois had been that, while prior adjudications could be used to impeach the credibility of a witness, they could not be used to impeach the credibility of a testifying defendant. But now, as a result of the legislature's 1998 overhaul of the Juvenile Court Act, prior adjudications became admissible in criminal proceedings against "*anyone *** including the minor or defendant if he or she testifies*," and then "only for purposes of impeachment and pursuant to the rules of evidence." (Emphasis added.) 705 ILCS 405/5-150(1)(c) (West 2000).

¶ 73    This brief historical review reveals a clear progression in the legislature's handling of prior adjudications in relation to impeachment. From 1965 until 1982, the Juvenile Court Act categorically prohibited the admission of prior adjudications "for any purpose whatever in any *** proceeding." From 1982 until 1999, the Juvenile Court Act authorized the admission of prior adjudications for purposes of impeaching a "witness." And now finally, from 1999 until the present, the Juvenile Court Act authorizes the admission of prior adjudications for purposes of impeaching "anyone *** including the minor or defendant if he or she testifies."

¶ 74    Given this clear legislative progression, one wonders why there is even a question as to whether defendant's prior adjudication was admissible in this case. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent (*Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000)), and the best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Here, the statutory language could not be more plain. Section 5-150(1)(c) expressly states that prior adjudications "shall be admissible" in relation to "anyone who has been adjudicated delinquent *** including the minor or defendant if he or she testifies, and then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials." 705 ILCS 405/5-150(1)(c) (West 2000). Where is the ambiguity or confusion? Defendant here "ha[d] been adjudicated delinquent," and the State sought to admit that adjudication "only for purposes of impeachment." After considering the *Montgomery* standard for admissibility (*i.e.*, the nature and recency of the crime and whether the probative value outweighed the prejudicial impact), the trial court ruled that the adjudication would be "allowed to be admitted for purposes of impeachment"

-16-

and "only if defendant should testify." Defendant testified, and the State impeached him with the adjudication. This was textbook compliance with the express statutory language, and the trial court's ruling ought to be affirmed.

¶ 75 Of course, my colleagues in the majority see things differently. To them, despite the insertion of language expressly stating that prior adjudications are admissible for purposes of impeaching "[the] defendant if he or she testifies," section 5-150(1)(c) means exactly the same thing after the 1998 amendment as it did before the amendment, when prior adjudications were *not* admissible to impeach a testifying defendant. *Supra* ¶¶ 37-38. In support of this result, the majority begins by explaining that, although a legislative amendment ordinarily gives rise to a presumption that the legislature intended to change the law, that presumption is not conclusive and may be overcome by other circumstances and considerations. *Supra* ¶ 35. Overcoming that presumption here, the majority maintains, is the fact that, for "well over a decade" preceding the 1998 amendment, the courts of this state had consistently construed the statutory phrase "pursuant to the rules of evidence for criminal trials" to mean "pursuant to the *Montgomery* decision." *Supra* ¶ 36. Thus, by retaining this phrase in the 1998 amendment "without modification" (*supra* ¶ 36), the legislature must have intended that phrase to mean the same thing after the amendment as it did before the amendment, *viz.*, "subject to the *Montgomery* decision." And because *Montgomery* states that prior adjudications are *not* admissible against a testifying defendant, the majority concludes that, whatever the legislature meant by amending section 5-150(1)(c), it did not mean that prior adjudications would now be admissible for purposes of impeaching a testifying defendant. Instead, the majority suggests, the legislature was merely recognizing the reality that Illinois courts had already crafted an exception to *Montgomery* for testifying defendants who "open the door" to the admission of otherwise inadmissible prior adjudications and that in such cases, and only in such cases, prior adjudications would be admissible. *Supra* ¶¶ 37-38.

¶ 76 I respectfully submit that the foregoing analysis is flawed in several respects. First, and most significantly, the majority fails to construe, on its face, the plain language of section 5-150(1)(c). Though it correctly acknowledges that this court's "primary objective in construing a statute is to ascertain and give effect to the intent of the legislature" (*supra* ¶ 35), the majority conspicuously omits the inevitable and subsequent corollary to that principle, namely, that "the best indication of legislative intent is the statutory language, given its plain and ordinary meaning." See *Illinois Graphics Co.*, 159 Ill. 2d at 479. This bedrock principle appears nowhere in the majority's discussion. The consequence is that, instead of first giving the statutory language its plain and ordinary meaning, the majority skips immediately to a presumption concerning the effect of legislative amendments and to asking whether "other circumstances and considerations" exist in this case to overcome that presumption. *Supra* ¶ 35. Why is the court invoking presumptions, however, if section 5-150(1)(c) is clear and unambiguous on its face? Conversely, if, on its face, section 5-150(1)(c) is anything other than clear and unambiguous, the majority is compelled to explain why. Indeed, even in the case that the majority cites for the presumption concerning the effect of statutory amendments, this court invoked the presumption only after concluding that, on its face, the statute at issue "[could] be construed in several ways." *Williams*, 208 Ill.

2d at 489. What are the "several ways" that, on its face, section 5-150(1)(c) can be construed? Absent a clear answer to that question, the majority should not be invoking interpretive presumptions, exceptions to interpretive presumptions, or any other external aids to construction. Instead, it should be applying the plain language of section 5-150(1)(c) as written, just as the circuit and appellate courts did below.

¶ 77    That said, even assuming that the majority's *invocation* of the interpretive presumption was proper in this case, its *application* of that presumption was not. Again, the majority begins with a familiar and unassailable principle, namely, that "[w]hile *** a material change in a statute made by an amendatory act is presumed to change the original statute, the circumstances surrounding the enactment of an amendment must be considered." See *Williams*, 208 Ill. 2d at 496. What the majority neglects to explain, however, is what this court means by "circumstances surrounding the enactment." *Williams* is very clear on this point:

> " 'An amendment of an unambiguous statute indicates a purpose to change the law, while no such purpose is indicated by the mere fact of an amendment of an ambiguous provision.' " *Id*. (quoting *O'Connor v. A&P Enterprises*, 81 Ill. 2d 260, 271 (1980)).

More recently, this court explained that, in determining whether a statutory amendment is merely a clarification of rather than a substantive change in the law, courts should consider whether (1) the enacting body declared that it was clarifying a prior enactment; (2) a conflict or ambiguity existed prior to the amendment; and (3) the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history. *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 299 (2010). If the answer to each of these questions is "no," then a change in the law was intended.

¶ 78    The foregoing principles are nowhere discussed or applied in the majority's opinion. This is regrettable, as application of the foregoing principles leads to the inescapable conclusion that the 1998 amendment to section 5-150(1)(c) changed the law governing the admissibility of prior adjudications for purposes of impeaching the accused. To begin with, the legislature in no way declared that the 1998 amendment was meant only to clarify the prior version of the statute. On the contrary, the legislation that included the 1998 amendment "radically altered" the Juvenile Court Act. *Taylor*, 221 Ill. 2d at 165. As importantly, no one can possibly dispute that, prior to the 1998 amendment, the meaning of section 5-150(1)(c) was clear and unambiguous. The majority itself emphasizes that, for well over a decade, the courts of this state uniformly and consistently construed that statute as permitting the admission of prior adjudications for purposes of impeaching any witness but the accused. Thus, under *Williams*, any amendment to the statute at that point would "indicate[ ] a purpose to change the law." And finally, not only is the 1998 amendment not "consistent with a reasonable interpretation of the prior enactment," it is directly contrary to every interpretation of the prior enactment that had been rendered up until that point. Again, prior to 1998, the courts of this state uniformly held that, under the Juvenile Court Act, prior adjudications could not be used to impeach the accused. The 1998 amendment says precisely the opposite–that prior adjudications "shall be admissible" for purposes of impeaching "anyone *** including the minor or defendant if he or she testifies." Thus, under every applicable

consideration, the legislature's intent to change the law could not be clearer, and the majority's conclusion to the contrary is simply untenable.

¶ 79    Next, I question the majority's conclusion that, in enacting the 1998 amendment, the legislature retained "without modification" the phrase "pursuant to the rules of evidence for criminal trials." *Supra* ¶ 36. As the majority correctly explains, "for well over a decade" prior to the 1998 amendment, the courts of this state understood the statutory phrase "pursuant to the rules of evidence for criminal trials" to mean "pursuant to the *Montgomery* decision." *Supra* ¶ 36. And everyone equally understood that, under the rule announced in *Montgomery*, prior adjudications are *not* admissible for purposes of impeaching the accused. According to the majority's own analysis, then, prior to the 1998 amendment, the phrase "pursuant to the rules of evidence for criminal trials" meant, *inter alia*, "pursuant to the rule that prior juvenile adjudications are *not* admissible for purposes of impeaching the accused." The 1998 amendment, however, changed that very rule by expressly making prior adjudications admissible for purposes of impeaching "anyone *** including the minor or defendant if he or she testifies." In other words, far from retaining "without modification" the phrase "pursuant to the rules of evidence for criminal trials," the 1998 amendment itself modified "the rules of evidence for criminal trials," thereby rendering any previous judicial construction of that phrase obsolete.

¶ 80    Finally, I would note that, when assessing the legislature's purpose in enacting a statutory amendment, this court ordinarily concludes that the legislature did in fact have a purpose. Sometimes that purpose will be to change settled law, and other times it will be to clarify unsettled law. But in every case, there will be an actual purpose. Here, by contrast, the majority effectively concludes that the 1998 amendment to section 5-150(1)(c) served no purpose whatsoever. Again, prior to 1998, section 5-150(1)(c) was universally understood to permit the admission of prior adjudications for purposes of impeaching any witness but the defendant. At the same time, the courts of this state had carved out an exception for defendants whose testimony "opens the door" to the admission of prior adjudications that would otherwise be inadmissible. See, *e.g.*, *Bunch*, 159 Ill. App. 3d at 513. And according to the majority, the sole purpose of the 1998 amendment was to recognize that reality. *Supra* ¶ 38 ("[T]he amendatory language simply recognizes that circumstances may exist where a juvenile adjudication is admissible against a testifying defendant, notwithstanding the general prohibition against the admission of such evidence under *Montgomery*."). In other words, according to the majority, the legislature's purpose in amending section 5-150(1)(c) was to declare that prior juvenile adjudications are admissible whenever they are admissible. This purpose is unlikely at best, and it is certainly not the one compelled by our ordinary analytical standards.

¶ 81    Before concluding, I wish to address briefly the special concurrence's suggestion that the foregoing analysis is "incorrect" in light of this court's recent adoption of Illinois Rule of Evidence 101, which provides that statutory rules of evidence that conflict with decisions or rules of this court are unenforceable. See Ill. R. Evid. 101 (eff. Jan. 1, 2011). This would be an interesting point were it not for the fact that defendant was tried and convicted in June 2008, more than two years before the adoption and subsequent enactment of the Illinois Rules of Evidence, of which Rule 101 is a part. Indeed, the majority opinion in this case, in

which the special concurrence "fully concur[s] and join[s]" (*supra* ¶ 64 (Burke, J., specially concurring)), expressly states that the Illinois Rules of Evidence do not apply retroactively to defendant's case. *Supra* ¶ 32 (explaining that, because Rule of Evidence 609(d) "postdates defendant's trial by over two years," the court "need not consider the effect, if any," it would have in this case). This is undeniably correct. The opening commentary to the Rules of Evidence states that:

> "the Illinois Rules of Evidence *are not intended to abrogate or supersede any current statutory rules of evidence.* The Committee sought to avoid in all instances affecting the validity *of any existing* statutes promulgated by the Illinois legislature. The Illinois Rules of Evidence are not intended to preclude the Illinois legislature from acting *in the future* with respect to the law of evidence in a manner that will not be in conflict with the Illinois Rules of Evidence, as reflected in Rule 101." (Emphases added.) Ill. R. Evid., Committee Commentary.

This commentary clearly demonstrates that the Rules of Evidence were meant to apply prospectively only and were never meant to reach back and govern proceedings that commenced well before their implementation. Likewise, although this court adopted the Rules of Evidence on September 27, 2010, the Rules did not become effective until more than three months later on January 1, 2011, another clear indication that the Rules were never meant to apply retroactively. See *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 187 (2011) (delayed implementation is clear evidence that provision in question is meant to apply prospectively only). Thus, while there may be an argument to be made that, for defendants prosecuted *after* January 1, 2011, the Rules of Evidence trump section 5-150(1)(c), that argument has no place in this case.[1]

¶ 82     What also has no place in this case is any consideration of how and/or whether our interpretation of section 5-150(1)(c) in this case would survive the enactment of our Rules of Evidence. The legislature enacted section 5-150(1)(c) effective January 1, 1999, some 12 years before this court enacted the Rules of Evidence. As importantly, at that time, this court expressly recognized that the legislature had the authority "to prescribe new rules of evidence and alter existing ones" and that "[s]uch action does not offend the separation-of-powers clause of our constitution." *First National Bank of Chicago v. King*, 165 Ill. 2d 533, 542 (1995); see also *People v. Orange*, 121 Ill. 2d 364, 381 (1988) (holding that this court's previous refusal to allow the substantive use of prior inconsistent statements "did not preclude the legislature from doing so"). Thus, given that this case is governed not by the Illinois Rules of Evidence but by section 5-150(1)(c), the only relevant question in this case is: what was the legislature's intent when it lawfully enacted section 5-150(1)(c) in 1999? If its intent was to override *Montgomery*, as I am convinced it was, it is of no present concern that that intent might conceivably render section 5-150(1)(c) unenforceable in proceedings commenced after January 1, 2011. I therefore resist the special concurrence's suggestion that this court's adoption of the Illinois Rules of Evidence in 2011 must inform and guide our

---

[1]In recognizing that this argument exists, I express no opinion as to its merit, one way or the other.

assessment of the legislature's intent circa 1999. The statute means what the statute means, and our job is to enforce it as written.

¶ 83    For these reasons, I respectfully dissent from the majority's interpretation of section 5-150(1)(c).

¶ 84                                    Opening the Door

¶ 85    I likewise disagree with the majority's conclusion that defendant's testimony in this case did not open the door to the admission of his prior adjudications for purposes of impeachment.

¶ 86    Although defendant argues that his testimony is not akin to the defendant's testimony in *Harris*, where the defendant falsely stated that he had led a crime-free life, a defendant's testimony need not be as emphatic as "I don't commit crimes" in order to mislead the jury about his or her criminal background. If the testimony, taken as a whole, is capable of a reasonable construction that would mislead the jury, that is sufficient to "open the door" to admission of a juvenile adjudication. Here, defendant's testimony that he had "never been in a situation like that before" reasonably can be construed as an attempt to mislead the jury by portraying defendant as inexperienced with the criminal justice system and thus "overwhelmed and prone to making a false statement" to police. 403 Ill. App. 3d at 319. As brought out on cross-examination, defendant, in fact, had been in a similar situation just 18 months earlier when he was questioned by the same detectives in connection with another case. The questioning in that case, like the questioning in the present case, resulted in the preparation of a typewritten statement.

¶ 87    Defendant's testimony that he had "never been in prison" may have been accurate; but his full statement that he had never been in prison "or nothing like that" reasonably can be construed as an attempt to mislead the jury by again portraying defendant as inexperienced or "unseasoned." 403 Ill. App. 3d at 319. That defendant may have meant something else is not dispositive. See *Harris*, 231 Ill. 2d at 591. Accordingly, I agree with the appellate court that defendant's testimony opened the door to the admission of his juvenile adjudication.

¶ 88                                    Conclusion

¶ 89    For both of the reasons set forth above,[2] I respectfully dissent.

¶ 90    JUSTICES GARMAN and KARMEIER join in this dissent.

---

[2]My conclusion that defendant's prior adjudication was properly admitted likewise disposes of defendant's ineffective assistance of counsel argument, as counsel is not ineffective for failing to keep out perfectly admissible evidence.