No. 2-08-0918    Filed:  6-30-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07--CF--402 |
| VICTOR VILLA, | ) ) | Honorable J. Todd Kennedy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

On June 18, 2008, a jury found defendant, Victor Villa, guilty of aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 2006)) and aggravated discharge of a firearm (720 ILCS 5/24--1.2(a)(2) (West 2006)).  On July 28, 2008, the trial court sentenced defendant to concurrent terms of 14 years' imprisonment on the aggravated battery conviction and 5 years' imprisonment on the aggravated discharge conviction.  In addition, the court ordered defendant to pay $20,083 in restitution.  On September 30, 2008, the court denied defendant's motion to reconsider his sentence and, that same day, defendant appealed.

On appeal, defendant argues that the trial court erred in allowing him to be impeached with a previous delinquency adjudication or, alternatively, that he was denied effective assistance of counsel where counsel did not proffer a "proper objection" to that evidence.  For the following

reasons, we conclude that defendant's prior adjudication was properly admitted and that counsel was not ineffective, and, thus, we affirm the judgment.

## I. BACKGROUND

Prior to trial, defense counsel moved in limine to exclude defendant's juvenile delinquency adjudication for burglary on the basis that it was more prejudicial than probative. The State noted that defendant was placed on 18 months' juvenile probation on August 28, 2006, and that the crimes with which he was currently charged occurred less than one year thereafter, on August 8, 2007, while he remained on probation. The State asserted that it intended to use the adjudication only if defendant testified and, then, solely for purposes of impeachment. The trial court asked defense counsel:

"THE COURT: Is there any case law that says you cannot use a juvenile delinquency finding for impeachment?

DEFENSE COUNSEL: No. In fact, I believe the case law specifically says--

THE COURT: (Interrupting) Says you can? So we're in the normal balancing.

DEFENSE COUNSEL: Yes."

The court concluded that the juvenile adjudication was recent, that it involved an offense related to truth and veracity, and that its probative value outweighed any prejudice to defendant. The court denied defendant's motion and ordered that the adjudication "will be allowed to be admitted for purposes of impeachment only if [defendant] should testify."

At trial, the evidence showed that, on August 8, 2007, Adrian Cazares and three friends fought with defendant, outside defendant's home in Belvidere, after one member of Cazares's group threw something at Joe Follis, defendant's friend. After the fight, Cazares returned home and his

uncle, Luis Perez, was outside. At some point, a black truck with tinted windows drove by and slowed down, and shots were fired at the house. Perez was shot and taken to the hospital, where he remained for two days. The recovered bullets were determined to have been fired from the same firearm, likely a revolver.

On August 9, 2007, police photographed a vehicle matching the description of the vehicle from which the shots had been fired. The vehicle was parked in the driveway of defendant's friend Angel Hernandez.

On September 29, 2007, defendant, who had heard that the police were looking for him, voluntarily went to the Belvidere public safety building and provided a statement to the police. In the statement, defendant explained that, on August 8, 2007, at around 9:30 p.m., he was outside when Follis passed by on a bike. A car then passed, someone yelled "what's up nigger," and defendant heard a bottle smash on the ground. Defendant went inside his home to get a knife and, when he returned to the street, he was surrounded. Defendant swung the knife and was hit in the mouth. Someone pulled defendant down and started "beating the shit out of [him]." Defendant had lumps and bruises on his head, face, and elbows. When he got up, defendant's attackers ran down the street, and defendant ran and saw Follis. Follis put his hand under his shirt and asked "should I blast them?" Defendant told him "no." Defendant then called Hernandez and told him: "I got my ass whooped." Hernandez said that he would be right there, and he drove a black SUV to meet defendant. Hernandez asked defendant if he was alright and then said "let's ride around." Defendant and Follis got into the SUV, and Hernandez's girlfriend was seated in the front passenger seat. Defendant stated that they drove to Cazares's house and slowed down. Defendant saw several cars

and people in front of the house. Defendant told Follis to "get them nigga's." Hernandez said "yeah, get them nigga's." Follis pointed his hand out the window and fired multiple shots.

Defendant's statement clarified that he first saw that Follis had a gun when driving to Cazares's. He explained that he, Follis, and Hernandez went to find Cazares because defendant was "really mad; I wanted to fuck them up." Defendant stated that they did not discuss shooting Cazares, but that, when he told Follis to "get them nigga's," he meant to "blast them." When asked why he was making the statement, defendant stated, "because it's the truth and I want the best outcome for me and my mom." Further, he added, "I am sorry about this man [and I] wish it had never happened. I wish I would've listened to my mom and stayed in my house that night." Defendant acknowledged that the statement was freely and voluntarily given and that there were no threats or promises made and no mistreatment.

At trial, however, defendant, then age 18, testified that his September 29, 2007, statement was not accurate. He testified that Hernandez told defendant to forget about the fight and that they got into Hernandez's car to drive Follis home. At Follis's direction, however, they drove to Cazares's house. Follis told Hernandez to slow down and then Follis rolled his window down and started shooting. According to defendant, everyone in the car was surprised. Defendant did not expect Follis to shoot at anyone and did not see a gun before Follis started shooting. It happened fast, and defendant was mad at Follis for doing it.

On direct examination, defendant testified that the police did not believe the truth and, so, while he agreed that he made the September 29, 2007, statement, he denied that it was all true. Significantly, defendant denied telling Follis to "get them nigga's" or to "blast them." According to defendant, he was scared because "[the police] were telling me that the State wasn't going to believe

-4-

me, you know. So [I] started telling them, you know, what had happened. But I started throwing some things in there, you know, to try to make my story believable." When asked why he would sign a written statement that contained false information, defendant answered, "all I can say is I was scared. I've never been in a situation like that before. I gave them that statement because, you know, they were saying that I was looking at prison time and stuff like that. I've never been in prison or nothing like that." (Emphases added.)

The State began its cross-examination of defendant by questioning his assertion that he had never before been in a situation similar to that he faced when he made his September 29, 2007, statement. The State confirmed with defendant that, on January 19, 2006, he had been interviewed by the same two detectives in another case. There, as here, he gave a statement, the police typed the statement, and he signed and initialed it. The State here then proceeded to examine defendant as to the alleged truth or falsity of each sentence in his 2007 statement.

On redirect examination, defendant agreed that the circumstances and procedures involved in making the 2006 and 2007 statements were similar, but he disagreed that the situations were the same. He noted that, in 2006, he was 16 years old and, therefore, was questioned as a juvenile. In contrast, he asserted, in 2007, he was questioned having already been charged as an adult with aggravated battery with a firearm. He claimed that the circumstances were, therefore, "very different."

The defense rested its case. In its rebuttal case, the State informed the court that it intended to inform the jury that defendant had been adjudicated a delinquent minor for burglary. Defense counsel commented "that's fine." The State read to the jury as follows: "People's Exhibit 36 is a certified copy of adjudication showing that this defendant, Victor Villa, was adjudicated a delinquent

minor for the offense of burglary on August the 28th of 2006." The court informed the jury that it could consider the adjudication only on the issue of defendant's credibility.

In closing argument, on four occasions, the State mentioned defendant's burglary adjudication, stating that the jury should consider the adjudication in determining defendant's truthfulness, that "I submit to you he is less truthful because of his burglary adjudication," and that "you can certainly determine that because he has a juvenile adjudication for burglary that he's not telling the truth." Further, the State commented that "the fact of the matter is that this 17 year old kid who tried to portray to you, right, I've never been through this before, gee, I've never--you know, I'm this 17 year old kid and I have just never been through this before, baloney. He's been with the same detective before being interviewed for a crime. What is the difference?" Defense counsel objected, and the trial court overruled the objection.

In his closing argument, defense counsel mentioned the State's reliance on the adjudication: "[Defendant] did have a juvenile adjudication for burglary, and the State is correct and you have been advised that you may consider that in weighing his credibility. It is not the case that he automatically has less credibility in your eyes because he has a juvenile adjudication for burglary. That's up to you to decide. It's evidence that you can consider. And you may consider it, but I suggest to you that the fact that a kid got caught up in the juvenile system and had a juvenile adjudication for something, not even a criminal conviction, should not be a substantial basis for you to disregard his testimony."

The jury found defendant guilty of both charges. Defendant appeals.

## II. ANALYSIS

Defendant argues that he was denied a fair trial because the trial court's admission of the juvenile adjudication violated "well-settled case law" and because his counsel's failure to bring that precedent to the court's attention constituted ineffective assistance. He argues that he was severely prejudiced by the evidence, noting that the State emphasized its importance and referred to it on four occasions during closing arguments.

Generally, we review for an abuse of discretion a trial court's decision to admit evidence. People v. Harris, 231 Ill. 2d 582, 588 (2008). However, where the facts are uncontested and the issue is whether, as a matter of law, evidence is admissible, our review is de novo. People v. Bellmyer, 199 Ill. 2d 529, 537 (2002); People v. Olsen, 388 Ill. App. 3d 704, 709 (2009).

### A. Admissibility of Adjudication

Defendant argues first that a juvenile adjudication cannot be used as impeachment evidence against a testifying defendant. Defendant refers to People v. Montgomery, 47 Ill. 2d 510 (1971), which, in adopting a proposed draft of Federal Rule of Evidence 609, provides generally that evidence of a prior conviction is admissible to attack a witness's credibility only if: "(1) the witness' crime was punishable by death or imprisonment for more than one year, or the crime involved dishonesty or false statement regardless of the punishment; (2) the witness' conviction or release from confinement, whichever date is later, occurred less than 10 years from the date of trial; and (3) the danger of unfair prejudice does not substantially outweigh the probative value of the conviction." People v. Harvey, 211 Ill. 2d 368, 383 (2004), citing Montgomery, 47 Ill. 2d at 516. Moreover, and with respect to juvenile adjudications, Montgomery states as follows:

> "Evidence of juvenile adjudications is generally not admissible under this rule. The judge may, however, allow evidence of a juvenile adjudication of a witness other than the

<u>accused</u> if conviction of the offense would be admissible to attack the credibility of an adult and the judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." (Emphases added.) <u>Montgomery</u>, 47 Ill. 2d at 516.

Thus, defendant concludes, the trial court's decision that the adjudication was admissible was erroneous. We disagree.

In 1999 (28 years after <u>Montgomery</u> was decided), with Public Act 90--590, the legislature amended section 5--150(1)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5--150(1)(c) (West 2008)) to explicitly permit a testifying defendant's impeachment with a juvenile adjudication. Whereas the version of the statute previously in effect permitted an adjudication to be introduced as impeachment <u>only</u> against <u>witnesses other than the accused</u> and pursuant to the rules of evidence for criminal trials (Ill. Rev. Stat. 1989, ch. 37, par. 801--10(1)(c); see also <u>People v. Massie</u>, 137 Ill. App. 3d 723, 730 (1985)), the 1999 amendment "radically altered" the Act to "provide more accountability for the criminal acts of juveniles." <u>People v. Taylor</u>, 221 Ill. 2d 157, 165 (2006). Therefore, section 5--150(1)(c) now provides that adjudications under the Act are admissible:

"in criminal proceedings in which anyone who has been adjudicated delinquent under Section 5--105 [(705 ILCS 405/5--105 (West 2008))] is to be a witness <u>including the minor or defendant if he or she testifies</u>, and then only for purposes of impeachment and <u>pursuant to the rules of evidence for criminal trials</u>." (Emphases added.) 705 ILCS 405/5--150(1)(c) (West 2008).

Accordingly, the State contends, section 5--150(1)(c) clearly and unequivocally permits introduction of a defendant's prior delinquency adjudication: (1) for impeachment purposes; (2) if the

defendant testifies; and (3) on the same basis as when any other witness with a delinquency adjudication testifies (i.e., pursuant to the rules of evidence for criminal trials).

Defendant disagrees and asserts that the statute's language that the adjudication is admissible only pursuant to the rules of evidence for criminal trials necessarily refers back to Montgomery and its progeny, which prohibit the admission of a juvenile adjudication as impeachment evidence against a defendant. Accordingly, he concludes, juvenile adjudications remain inadmissible against testifying defendants.

We find this interpretation curious. The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, the best evidence of which is the language of the statute. People v. McClure, 218 Ill. 2d 375, 381-82 (2006). We must construe the statute as a whole, so as not to render any part of it superfluous or meaningless. McClure, 218 Ill. 2d at 382. It is presumed that in enacting legislation the legislature did not intend absurdity, injustice, or inconvenience. People v. Jones, 134 Ill. App. 3d 1048, 1051 (1985).

Here, defendant's interpretation of the last clause of the statute renders meaningless and superfluous the statute's provision that, in criminal proceedings where the defendant testifies, a prior juvenile adjudication may be introduced for impeachment purposes. Defendant's interpretation ignores that the phrase "pursuant to the rules of evidence for criminal trials" existed in the statute prior to its amendment (when it applied only to witnesses other than defendants) and that, while courts interpreted that language as signifying that the statute was subordinate to Montgomery (see, e.g., Massie, 137 Ill. App. 3d at 731), the statute was viewed as subordinate only in the sense that, before the adjudication could be used against the testifying witness, it needed to meet the requirements identified in Montgomery. See, e.g., People v. Newborn, 379 Ill. App. 3d 240, 248

(2008). Thus, the legislature's postamendment inclusion of that language suggests that the meaning remains the same, such that, now, before an adjudication may be used against a testifying <u>defendant</u>, it must meet the <u>Montgomery</u> requirements.

Nevertheless, defendant's interpretation is not wholly without support. Recently, the Fourth District considered, in the context of an ineffective assistance claim, whether juvenile adjudications are admissible as impeachment evidence against defendants. <u>People v. Coleman</u>, No. 4--08--0682, slip op. at 7-10 (April 16, 2010). The court found that the statute and <u>Montgomery</u> could be "reconciled" by considering section 5--150(1)(c)'s language, "pursuant to the rules of evidence for criminal trials." The court reasoned as follows:

"In other words, the legislature has said a defendant who chooses to testify may be impeached with a juvenile adjudication but has conditioned the use of such impeachment on the rules of evidence for criminal trials.

Our supreme court has adopted Rule 609 as a rule of evidence to be used by the trial courts. Rule 609 does not permit impeachment of a defendant with a juvenile adjudication. Thus, as we sit here today, a juvenile adjudication of a defendant who testifies is normally not admissible." <u>Coleman</u>, slip op. at 8-9.

To us, this seems less like reconciliation and more like a conclusion that the statute simultaneously takes away what the amendment sought to add. Respectfully, we believe that <u>Coleman</u>'s interpretation is incorrect. Interpreting the statute's language, "pursuant to the rules of evidence for criminal trials," as referring to <u>Montgomery</u>'s prohibition against the use of prior juvenile adjudications against defendants for impeachment purposes renders <u>meaningless</u> the amendment's insertion into the statute of "including the minor or defendant" as one who <u>may</u> be impeached with

a prior adjudication. "Where the statute was enacted after judicial opinions on the matter, it must be presumed that the legislature acted with knowledge of the prevailing case law." Jones, 134 Ill. App. 3d at 1052. As noted above, "pursuant to the rules of evidence for criminal trials" had been interpreted as operating in tandem with Montgomery such that, when a prior juvenile adjudication is introduced against a witness for impeachment purposes, the Montgomery balancing factors must be applied. Thus, we interpret the amended statute in a consistent manner and conclude that, when a defendant testifies, a prior juvenile adjudication may be used for impeachment purposes as long as Montgomery's factors are satisfied.

Defendant notes that section 5--150 applies to both civil and criminal proceedings. 705 ILCS 405/5--150(1)(c) (West 2008). Consequently, he argues, the language "including the minor or defendant" in section 5--150(1)(c) applies to civil proceedings, whereas the language "pursuant to the rules of evidence for criminal trials" means that, in a criminal proceeding, Montgomery applies. We reject this interpretation because it ignores the plain language of section 5--150(1)(c), which introduces the rule as applying "in criminal proceedings" where a defendant is to be a witness. Accordingly, we conclude that, here, once the trial court found that defendant's prior juvenile adjudication satisfied Montgomery's requirements for admissibility (type of crime, date of adjudication, probative value outweighs prejudice, etc.), section 5--150(1)(c) permitted for impeachment purposes the use of defendant's prior juvenile adjudication.

To the extent that defendant suggests that the legislature did not have the power to modify the Montgomery rule, he is incorrect. Unlike a supreme court rule that is promulgated and adopted by the supreme court pursuant to its constitutional authority and that prevails over a conflicting statute (People v. Joseph, 113 Ill. 2d 36, 43 (1986); People v. Youngbey, 82 Ill. 2d 556, 560 (1980)),

Montgomery adopted a rule of evidence to be used by the trial courts. Currently, Illinois evidentiary rules derive from case law (e.g., Montgomery) or statutory authority,[1] and it is clear that "[t]he legislature has the power to prescribe new rules of evidence and alter existing ones, and to prescribe methods of proof. Such action does not offend the separation-of-powers clause of our constitution." (Emphasis added.) First National Bank of Chicago v. King, 165 Ill. 2d 533, 542 (1995); see also People v. Rolfingsmeyer, 101 Ill. 2d 137, 140 (1984) (same); People v. Wells, 380 Ill. 347, 354 (1942) (same). Therefore, as noted in the foregoing case law, the legislature acts within its power when it amends a statute to alter a rule of evidence announced in a judicial decision. See also Hamilton County Telephone Cooperative v. Maloney, 151 Ill. 2d 227, 232-33 (1992) (the legislature is powerless to overrule judicial decisions but may change statutes).

Irrespective of our interpretation of section 5--150(1)(c), we conclude that defendant's adjudication was admissible because he opened the door to its use. In 2008, in Harris, our supreme court declined to decide whether section 5--150(1)(c) makes admissible for purposes of impeachment a defendant's prior juvenile adjudication, because it concluded that, in the case before it, the defendant's testimony opened the door to admission of his prior adjudications. Harris, 231 Ill. 2d at 592-93. There, the defendant was charged with armed robbery. In his testimony, the defendant

---

[1]While not exhaustive, some examples include the following sections of the Code of Criminal Procedure of 1963: section 115--5 (business records) (725 ILCS 5/115--5 (West 2008)); section 115--5.1 (coroner's records) (725 ILCS 5/115--5.1 (West 2008)); section 115--7.4 (evidence in domestic violence cases) (725 ILCS 5/115--7.4 (West 2008)); section 115--10 (hearsay exceptions) (725 ILCS 5/115--10 (West 2008)); and sections 115--10.1, 115--10.2, and 115--10.2a (prior statements) (725 ILCS 5/115--10.1, 115--10.2, 115--10.2a (West 2008)).

commented that he did not commit the crime in question and that he lived a productive life, whereas " 'people who commit robberies' " have motives. Further, the defendant stated, " 'I don't commit crimes.' " Harris, 231 Ill. 2d at 585. The State, on rebuttal, introduced evidence of the defendant's five prior felony juvenile adjudications for aggravated battery with a firearm, aggravated discharge of a firearm, theft, and unlawful possession of a controlled substance. Harris, 231 Ill. 2d at 585.

The supreme court noted that "[t]here is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible." Harris, 231 Ill. 2d at 588. Thus, the court considered the question to be whether the defendant's testimony was an attempt to mislead the jury--if so, the evidence was admissible. The supreme court reiterated that great deference is given to a trial court's interpretation of a witness's testimony and, therefore, where the defendant's testimony could reasonably be construed as an attempt to mislead, it could not conclude that the trial court abused its discretion in admitting the adjudications. Harris, 231 Ill. 2d at 591.

Here, defendant testified that the statement he gave to the police on September 29, 2007, was largely false. When asked why he would give the police a false statement and sign it as being true and accurate, defendant explained that he had been scared and that he had never before been in such a situation. Given that defendant had, in fact, fairly recently given another statement in similar circumstances (i.e., different crimes, but same officers and general process), it is not unreasonable to construe defendant's attempt to portray himself as unseasoned, and, therefore, overwhelmed and prone to making a false statement, as an attempt to mislead the jury. Defendant asserts that his reference to having never been in this situation or "nothing like that" meant only that he had never before been imprisoned or charged as an adult--which was not a lie. While this might be what

defendant meant, it was not unreasonable, at the time, to construe it differently. Harris, 231 Ill. 2d at 591.

Further, we reject defendant's argument that his testimony did not open the door to the evidence because, unlike the defendant in Harris, he did not testify that he had led a crime-free life. Although he did not explicitly assert that he had led a crime-free life, defendant portrayed himself as overwhelmed and scared during questioning because he had never before encountered such a situation. It would not be unreasonable to construe this as an attempt to imply that he had led a crime-free life. Moreover, the question for admissibility is not whether defendant testified to having led a crime-free life; rather, the "pivotal question" is whether defendant testified in a manner that may reasonably be construed as an attempt to mislead the jury. Harris, 231 Ill. 2d at 590-91.

Therefore, although the trial court here made the determination that the juvenile adjudication would be admissible for impeachment purposes if defendant testified, i.e., even before defendant opened the door to the evidence, we may affirm the court's decision to admit the evidence on any basis supported by the record. People v. Dinelli, 217 Ill. 2d 387, 403 (2005). Defendant testified that the jury should discount the veracity of his statement because he had never before been in such a situation. It was not unreasonable to interpret defendant's testimony as an attempt to mislead and, therefore, defendant opened the door to the impeachment evidence. We conclude that the court did not abuse its discretion in allowing the State to impeach defendant with evidence of his prior juvenile adjudication.

### B. Ineffective Assistance

Defendant next asserts that his trial counsel rendered ineffective assistance when he failed to direct the court to Montgomery and "unnecessarily and wrongfully" conceded that caselaw supported

admission of the adjudication. Defendant argues that his attorney demonstrated an inadequate knowledge of criminal procedure and the rules of evidence and that he was especially prejudiced because the adjudication was emphasized by the State four times in closing arguments.

To demonstrate ineffective assistance of counsel, a defendant must show both: (1) that his or her attorney's performance fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); People v. Villarreal, 198 Ill. 2d 209, 228 (2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome, in that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. People v. Enis, 194 Ill. 2d 361, 376 (2000). "There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. [Citation.] The failure to satisfy either the deficiency prong or the prejudice prong of the Strickland test precludes a finding of ineffective assistance of counsel." Enis, 194 Ill. 2d at 377.

We cannot conclude that defense counsel's performance was objectively deficient or that defendant was prejudiced. First, we note that in the colloquy between the court and counsel at oral argument on the motion in limine, they referred to the "normal balancing," which, we presume, was a general reference to Montgomery. Thus, it does not appear that counsel was completely unaware of Montgomery or that he, as defendant asserts, possessed an inadequate knowledge of the law. Rather, presuming that counsel's performance constituted reasonable assistance, it appears that counsel's "concession" was in keeping with his obligation to acknowledge to the court the current

state of both the Act, which now purports to permit admission of adjudications for impeachment when defendants testify, and case law, such as <u>Harris</u>.

Second, defendant was not prejudiced by defense counsel's performance because the adjudication became admissible when defendant opened the door to his own impeachment. It is true that the State heavily relied on the adjudication to argue that defendant lacked credibility. Given the court's ruling on the motion <u>in</u> <u>limine</u>, defendant made the decision to testify knowing that the State intended to do just that. Defense counsel, in turn, made his arguments as to why the adjudication should not weigh heavily in the jury's deliberations. However, defense counsel's performance regarding the adjudication, his objections thereto, and his failure to cite various authority cannot form the basis of an ineffective assistance claim here because defendant's own testimony provided a separate basis for admitting the adjudication. We cannot conclude that counsel's performance rendered the proceeding fundamentally unfair or unreliable where the adjudication was properly admitted. Accordingly, we reject defendant's ineffective assistance claim.

### III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Boone County is affirmed.

Affirmed.

O'MALLEY and SCHOSTOK, JJ., concur.