2020 IL App (2d) 171042-U
No. 2-17-1042
Order filed August 7, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1281 |
| JEFFREY W. MORROW, | ) ) | Honorable Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not abuse its discretion in ruling that defendant's proffered testimony, that he admitted to sexually abusing the victim, C.B., in order to be agreeable to the police who were questioning him, would open the door to cross-examination by the State on his further statements to the police admitting to abuse of several other children. The court also did not err in declining to question a juror about an allegation by the defendant's nephew that the juror mouthed the words "He's guilty" to another juror on the first day of trial.

¶ 2     Defendant, Jeffrey W. Morrow, appeals from his conviction on 20 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). There are two issues on appeal: (1) whether the trial court abused its discretion in determining that defendant's proposed

testimony would open the door to the admission of prior bad acts; and (2) whether the trial court abused its discretion in refusing to question a juror about an alleged comment. For the reasons that follow, we affirm.

¶ 3                                                   I. BACKGROUND

¶ 4     On May 11, 2016, defendant was indicted on 20 counts of predatory criminal sexual assault of a child (*id.*). Each count alleged that defendant knowingly placed his mouth on the penis of the male minor victim, C.B., who was under the age of 13, between the dates of December 2, 2012, and November 20, 2015.

¶ 5                                                 A. Pretrial Motions

¶ 6     On November 18, 2016, defendant moved to suppress statements made during a November 20, 2015, police interview. He alleged a violation of his fifth and sixth amendment rights to counsel.

¶ 7     Evidence adduced at the suppression hearing established that, on November 10, 2015, Waukegan police detective Timothy Ives, along with another detective, interviewed defendant about sexual allegations concerning minor victim, A.Z. The interview was videotaped. The State represented to the trial court that the video was "a six-plus hour recording," which included time that defendant was alone in the interview room. During the interview, defendant commented on five or six additional unnamed victims. Defendant told Ives that he was not ready to talk about them at that time. Ives told defendant that he might want to talk with him about the other individuals in the future. Later that day, defendant was charged with sex crimes against A.Z. and brought to bond court.

¶ 8     Ives testified further that, on November 20, 2015, after meeting with additional possible victims and watching a forensic interview of C.B., Ives interviewed defendant, who was in

custody, a second time. Again, the interview was videotaped. The video was a little over a half hour in length and was played for the court. Ives testified that, after the interview, defendant was indicted on crimes against additional victims.

¶ 9     The trial court denied defendant's motion to suppress, holding that defendant knowingly and voluntarily waived his *Miranda* rights at each interview and that his sixth amendment right to counsel had not attached.

¶ 10     On March 23, 2017, the State moved to admit evidence of other acts of sexual abuse as propensity evidence. According to the motion, defendant had been charged in five other cases with separate but similar offenses against five male minor victims. The trial court denied the motion, finding that, although the evidence was relevant and probative, the probative value was outweighed by its prejudicial effect. The court's ruling resulted in significant editing of defendant's recorded interview.

¶ 11                             B. Jury Trial

¶ 12                        1. The State's Witnesses

¶ 13     Defendant's jury trial began on August 22, 2017. C.B. testified that he was 14 years old and lived in Kenosha, Wisconsin, with his mom. He was introduced to defendant when he was 10 years old by his half-brother, Tyler, who also lived in Wisconsin. C.B. and Tyler began to "hang out" with defendant. Defendant would pick them up and bring them to his house in Waukegan, where they would play video grams. They went to defendant's house "[r]egularly" and sometimes spent the night. On occasion, C.B.'s friend, A.R., would go with them to defendant's house. C.B. testified that on one occasion, when he was 10 years old, he was asleep in the guestroom at defendant's house and "woke up with [defendant] giving [him] oral sex." C.B. testified that

defendant's mouth was touching his penis. C.B. was "scared" and "[f]reaked out." Defendant told him not to tell anyone and C.B. went back to sleep.

¶ 14    According to C.B., defendant performed oral sex on him approximately 20 times, in the guestroom, basement, kitchen, living room, and defendant's bedroom, from the time that C.B. was 10 years old until the police got involved when he was 12 years old. Once, A.R. walked into the guestroom while defendant was sucking on his penis. A.R. was "[m]ad" and said, "stop." Although Tyler was sometimes in the house during the sexual acts, Tyler never saw anything. Defendant's wife, Lucy, was never in the house when the sexual acts occurred. C.B. continued to visit defendant, because defendant would tell him that "it's not going to happen again. It would be video games and hanging out."

¶ 15    C.B. testified that, on November 18, 2015, he told his mom that he and defendant had been "having oral sex." C.B. then met with an interviewer, named "Lynn." He told the interviewer that the first time defendant had sexual contact with him, defendant was "kissing [his] penis," but that later defendant "would suck on it."

¶ 16    On cross-examination, C.B. testified that he was in third grade when he met defendant. C.B. saw defendant about every other weekend until C.B. was in sixth grade, sometimes alone and sometimes with A.R. or Tyler. Defendant set up meetings through C.B.'s mom, who knew that C.B. was going to defendant's house. During the entire time C.B. was going to defendant's house, Lucy and defendant lived together and shared the master bedroom; they eventually married. Tyler was in the living room the first time defendant assaulted C.B., but he did not yell or scream for Tyler; Lucy was not home. When C.B. first began going to defendant's house, Lucy worked until about 8:00 p.m., but later she switched to working mornings.

¶ 17 A.R. testified that he was 18 years old and lived in Kenosha, Wisconsin. He met defendant when he was at a pool party with C.B., who was his close friend. He went to defendant's house with C.B. about seven times; he never went alone. He spent the night at defendant's house a few times. On one occasion, he walked into the guestroom and saw defendant on his knees sucking on C.B.'s penis. He did not try to stop defendant, because he was "a little guy" and defendant was "really tall and big." Defendant told them " 'What happens at Jeff's house stays at Jeff's house.' " After that had happened, A.R. returned to defendant's house with C.B. several more times. When asked why, A.R. explained that it was because "[C.B.] was going there, and [he] hung out with [C.B.] all the time." He saw defendant do the "same thing" to C.B. about five more times. He saw the act occur about once in the guest room, once in the living room, and three times in the basement. He never told anyone about it, because he was afraid.

¶ 18 C.B.'s mom, Cynthia, testified that she met defendant through her friend, Janet, who was Tyler's mom. Janet had dated defendant "for a long time." Cynthia was friends with defendant and trusted him. C.B. had been going to defendant's house for about two or three years before C.B. told her what defendant had been doing. C.B. had gone to defendant's house over 20 times. On cross-examination, Cynthia agreed that, when she met with police detectives on November 20, 2015, she gave a handwritten statement indicating that C.B. " 'has been over to [defendant's] house about ten times.' "

¶ 19 Lynn Aladeen, an interviewer with the Lake County Children's Advocacy Center, testified that she interviewed C.B. on November 20, 2015. She identified the video of the interview and it was played for the jury.

¶ 20 Ives testified that he had observed Aladeen's interview of C.B. Later that day, he interviewed defendant. A video of his interview with defendant was admitted into evidence and

played for the jury. Prior to playing the video, the trial court informed the jury that the video "has been edited pursuant to Court ruling. You should not question the reason for this procedure nor should you speculate about the reasons for this." In the video, defendant told Ives that sexual contact with C.B. started "maybe two years" ago. When asked how many times he had oral sex with C.B., he responded, "no more than nine or ten" times. On cross-examination, Ives testified that he also interviewed A.R., who told him that he had been to defendant's house about two to three times.

¶ 21    The State rested. Defendant filed a motion for a directed verdict, which was denied.

¶ 22                            2. The Defense Witnesses

¶ 23    For the defense, David Hash testified that he was 16 years old and that defendant was his uncle. David had "a hearing issue" and testified through an American Sign Language interpreter. He testified that he could communicate "somewhat" without an interpreter because he could "read lips really well." David testified that, during the 2012-2013 school year, he saw defendant "[o]nce in a while [*sic*]." He did not attend school for the 2013-2014 school year, and during that time, he saw defendant "[o]ften." David would spend weekends or a full week at defendant's house, once or twice a month. When he started school in 2014, he would see him once every two months for the weekend. He remembered seeing Tyler at defendant's house between 2012 and 2015. He did not know C.B. or A.R. and never saw them at defendant's house.

¶ 24    Lucy Morrow, defendant's wife, testified that they were married in December 2014. She has known defendant for over 20 years and has lived with him for the past 9 years. She works from 7:30 a.m. to 4:30 p.m. on Monday through Thursday and half days on Fridays. She has had the same hours for the past 17 years and has never worked nights. She said that C.B. was at their house "[o]nce in a while." She saw him there about 10 times. Tyler and A.R. also came to their house.

C.B. was never there alone; he was always with Tyler. She saw C.B. with A.R. about three times. C.B. usually came over on Fridays and spent the night. Lucy was usually present when C.B. spent the night, but there may have been one occasion when she was away overnight for a cancer walk. She never saw defendant sexually abuse C.B.

¶ 25     3. Defendant's Proposed Testimony and the Trial Court's Ruling

¶ 26    After presenting the final defense witness, defense counsel made a motion asking the trial court to consider defendant's proffered testimony and to rule on whether the testimony would open the door to the admission of other acts. Defense counsel advised the court as follows:

> "[Defendant] will deny he ever sexually abused [C.B.]. He's going to testify to some essentially biographical data, how old he is, where he lives; he's married. That he served in the army in the 1990's for a couple years. Little bit about his employment history. And then we intend on asking him why he told Detective Ives what the jurors saw in the video. Why he told him that he sexually abused [C.B.] on nine or ten occasions.
>
> Based on our conversation with [defendant] he's given me permission to disclose this. We believe he would testify that he was attempting to be agreeable with the police in that situation. He can't really explain or doesn't really know why he said what he said. Just that he was trying to be agreeable and or cooperative in that moment. That would be the substance of his testimony.
>
> I don't believe it would be more—depending how many biographical questions we ask, not more than a five or at most ten minute direct, but there are going to be two questions about the allegations in this case, a specific question whether or not he did it, and one question to why he told Detective Ives that he did it, and that would be his answer. We would not elaborate. I will say defense is taking extreme precautions since opening

statements in light of this Court's what I have repeatedly called a very favorable ruling on keeping out other acts.

In light of all of our conversations with [defendant] since November of 2015 when I was appointed, all of the different things he's told us about all of the allegations in this case, but more recently since the State elected on [C.B.'s] case, we believe that he can say those things, and we will limit it to those things in an effort to make sure we limit his answer so that he does not open the door. We won't go into anything else."

¶ 27    In response, the State noted that defense counsel fought very hard to keep out evidence that defendant committed a number of other crimes and that, as a result of the trial court's favorable ruling, the jury was shown only a very short portion of the police interview of defendant. The State argued that defendant now wanted to be able to deny committing the offense and to justify his admission of the offense by stating that he was simply being agreeable. The State argued:

"What that would leave the *** jurors thinking, is that this is really weird. We have a six minute video. There is a lot of stuff that was edited out. We heard that there was stuff edited out. For all we know the police are doing something before this or after this, and sure enough the defendant, he came in here and he was just saying this to get the police off his back and be agreeable."

The State argued that defendant should not be allowed to "insert a false confession defense into the mind of the jurors and leave it at that, hamstringing us from being able to do anything with that." The Stated argued:

"If they want to do this they should expect the State will want to play the entire first interview of the defendant, the entire second interview and show the entire interaction that

the defendant had with the police department in these cases to show this was the furthest thing from a defendant just simply trying to be agreeable.

This was somebody who came in and once the bandaid [*sic*] was ripped off was more than willing to talk about no less than six children he abused."

¶ 28    In making its ruling, the trial court stated:

"The State is allowed cross examination ***, and that inquiry on balance needs to involve their questioning the defendant why this is the first time the defendant is heard stating that he made those statements only because he was attempting to be agreeable to the police.

The defense has repeatedly stated that the Court has made a favorable ruling for them regarding the denial of other crimes evidence. I have to look at this in context of the totality of the defendant's statements, plural, as I know them to be based on what I saw and watching during the motion to suppress. And the defense's request to allow this limited testimony of the defendant begins to create a situation where the Court's favorable ruling on admissibility of other crimes evidence [is] being used not only as a shield, but also as a sword."

The court stated that it had reviewed its notes concerning its ruling on defendant's first statement, which was deemed inadmissible because it involved all of the other victims. The court noted that defendant's first interview with Ives went for more than four hours, during which time he had mentioned other victims, and at the end of the interview, Ives tells defendant that, at some point, he would like to talk to defendant about the other victims and asked defendant if he was "cool with that." Defendant responded affirmatively. Ives also stated, "[i]f something comes up, can I ask you—" and defendant responded, " 'if something comes up, I know I am fucked no matter how you look at it.' " The court held:

"For the Court to allow the question and answer series the defense proposes in their proffer and limit the State exploring the entire context of how that conversation began would be handcuffing the State and allowing the defense to use my favorable ruling as a sword.

So if the defense wants to put the defendant on the stand with that question and answer period, that door could be open to what I have stated."

¶ 29    The defendant chose not to testify, and the defense rested.

¶ 30                            4. The State's Rebuttal Witness

¶ 31    In rebuttal, the parties stipulated that, if called to testify, Michelle Chonillo, a private investigator hired by the defense, would testify that, on April 21, 217, she, along with defense counsel, met with Lucy, who told them that, while living with defendant, she attended an overnight work conference one to two times. Lucy also told them that, on approximately one or two occasions, she had slept elsewhere or left defendant alone at home.

¶ 32                            5. Incidents at Trial Involving the Jury

¶ 33    Two incidents occurred involving the jury. The trial court was notified of the first incident on the morning of August 23, the second day of trial. At that point, the State had presented three of its witnesses. The court was advised that, on the prior evening, one of the jurors had reported to a security officer that someone had taken his picture. The court heard testimony from the officer. According to the officer, as he was escorting the jurors to the juror lot at the end of the day, juror No. 68 informed him that, earlier that day, two individuals were taking either videos or pictures of the jury. The juror described the individuals to the officer. Based on the officer's testimony, the court determined that that individuals were defendant's nephew, David, who was a defense witness, and David's mother, Mary Hash (Mary). Defense counsel asked the court to question the

juror. The court heard testimony from juror No. 68, who told the court that, while on a break during the jury selection process, a woman took a picture of him and the juror who was next to him. There was a young boy with the woman. In response to questioning, the juror assured the court that, should the individuals involved testify, the incident would not impact his ability to be impartial. The defense moved to dismiss the juror, and the trial court granted the motion.

¶ 34    The trial court was notified of the second incident on August 24, 2017, the third day of trial, after learning that the jury had reached a verdict. Defense counsel advised the court that, earlier that day, Mary had telephoned to report the following. According to Mary, David told her that, on the first day of trial, he was sitting in the hallway while Mary was in the courtroom watching the proceedings. When the jury was released, David saw (by reading his lips) one man say to another, " 'he's guilty.' " When David testified the next day, he realized that the person who made the comment was a juror. Counsel advised the court that David and Mary were no longer in town, having returned to Wisconsin the day before. Counsel made a motion asking the trial court to inquire of the juror, whom he believed to be juror No. 65, as to whether he had made the comment, and the State objected. The State argued that David and Mary were the same individuals who had already caused one juror to be released and that they were not available for questioning. The State argued that there was "no reason to give this latest bit of information from them any credence." The trial court denied the motion, finding the timing "problematic," given that David was not available for an inquiry and that the jury had already returned its verdict.

¶ 35                                6. Jury Verdict and Sentence

¶ 36    The jury found defendant guilty of 20 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). The trial court sentenced defendant on 10 of the 20 counts to consecutive 12-year prison terms.

¶ 37                                    C. Posttrial Motions

¶ 38     On October 5, 2017, defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, arguing, *inter alia*, that the trial court erred in finding that defendant's proffered testimony would open the door to the admission of other acts and that it erred in refusing to question juror No. 65, prior to accepting the jury verdict, regarding a possible statement made concerning defendant's guilt. With respect to its ruling on the admission of prior bad acts, the court stated:

> "Based on the contextual comments that were desired to be made by the defendant regarding the totality of his statements to the police and their truthfulness, the Court felt then and feels still now that testimony of that nature could possibly open a door to potential questioning regarding the entire statement and its voracity [*sic*] and, as a result, the Court rests on the rulings made at the time of trial."

With respect to its refusal to question juror No. 65, the court stated that, "absent more information and given the information that the Court has regarding this alleged incident, including the possible prejudice of the witness," it would stand by its ruling.

¶ 39     Defendant timely appealed.

¶ 40                                    II. ANALYSIS

¶ 41                  A. Propriety of the Trial Court's Ruling that Defendant's
                     Proposed Testimony Opened the Door to Other Bad Acts

¶ 42     Defendant argues that he was denied his constitutional right to testify and present a defense, where the trial court erroneously ruled that defendant's proposed testimony would open the door to the admission of evidence of his other acts of sexual conduct. The State responds that the court properly exercised its discretion when it determined that defendant's proposed testimony would open the door to evidence of other acts of sexual conduct. We agree with the State.

¶ 43    The parties dispute the appropriate standard of review. A trial court's decision regarding the admissibility of evidence is typically reviewed for an abuse of discretion. *People v. Zwart*, 151 Ill. 2d 37, 44 (1992). However, defendant contends that whether a defendant opened the door to the admission of otherwise inadmissible evidence is a legal issue that is reviewed *de novo*. In support, he cites *People v. Villa*, 2011 IL 110777, ¶ 44. The State responds that the appropriate standard of review is abuse of discretion and that *Villa* is distinguishable.

¶ 44    A closer look at *Villa* shows that it does not support defendant's assertion that *de novo* review applies here. In *Villa*, after the defendant testified, the State was permitted to publish a certified copy of the defendant's prior juvenile adjudication for burglary. *Id.* ¶ 15. During closing argument, the State asserted that the juvenile adjudication was a basis for finding the defendant untruthful. *Id.* On appeal, the defendant argued that a juvenile adjudication cannot be used as impeachment evidence. *People v. Villa*, 403 Ill. App. 3d 309, 314 (2010). This court disagreed. *Id.* at 315. We held that, pursuant to section 5-150(1)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/5-150(1)(c) (West 2008)), a juvenile adjudication may be admitted against a testifying defendant for impeachment purposes. *Villa*, 403 Ill. App. 3d at 315. After making that determination, we went on to hold that "[i]rrespective of our interpretation of section 5-150(1)(c), ***[the] defendant's adjudication was admissible because he opened the door to its use." *Id.* at 318. The defendant appealed to the supreme court. *Id.* at 314.

¶ 45    The supreme court, in reviewing our *alternative* determination that the defendant "opened the door" to the use of his juvenile adjudication, stated:

> "Although evidentiary rulings are typically left to the sound discretion of the trial court [citation], the issue here is whether the appellate court correctly held, as a matter of law, that defendant opened the door to the admission of his juvenile

adjudication. On this purely legal issue our review proceeds *de novo.* [Citation.]" *Id.*

¶ 44.

According to defendant, the above language supports his argument that *de novo* review applies

here. We disagree. In *Villa*, the supreme court was not reviewing the *trial court's* determination

that the defendant had opened the door to the admission of his juvenile adjudication; the trial court

made no such determination. Instead, the court was reviewing the *appellate court's* alternative

basis for affirming the trial court, *i.e.*, our conclusion that, even if defendant's juvenile adjudication

was inadmissible for impeachment purposes under the relevant statute and case law, it was

otherwise admissible because the defendant opened the door to its use. Here, however, we are

asked to review the *trial court's* determination that defendant opened the door to admission of the

otherwise inadmissible evidence. Thus, an abuse of discretion standard applies. See *People v.*

*Harris*, 231 Ill. 2d 582, 588-91 (2008) (giving "great deference" to the trial court's interpretation

of the witness's testimony in reviewing the court's determination that the testimony opened the

door to admission of prior juvenile adjudications for an abuse of discretion). In any event, we note

that under either standard, our result here would be the same.

¶ 46    We turn to the merits. "There is no question that a defendant can open the door to the

admission of evidence that, under ordinary circumstances, would be inadmissible." *Id.* at 588.

When determining whether a defendant opened the door, we must determine whether the defendant

was "attempting to mislead the jury." *Id.* at 590. "If he was, then he 'opened the door' and the trial

court was well within its discretion to allow the admission of [the otherwise inadmissible evidence]

for purposes of impeachment. If he was not, then defendant's testimony was not a proper basis for

the admission of that evidence." *Id.* Thus, the question is whether defendant was attempting to

mislead the jury. *Harris* and *Villa* are instructive.

¶ 47　For instance, in *Harris*, when the defendant was asked on direct examination whether he had committed the armed robbery in question, instead of simply answering in the negative, he testified that " '[t]here is no possible way that I could have committed this crime.' " *Id.* at 584-85. He continued: " 'I live just like any of the 12 jurors, like you live. I don't commit crimes.' " *Id.* at 585. The trial court allowed the State to use evidence of the defendant's two most recent juvenile adjudications to impeach his assertion that he did not commit crimes. *Id.* The supreme court held that, although the defendant's answer could have been construed—so he claimed on appeal—as " 'a present tense statement of how he conducts his life' that was never meant to 'falsify or misstate his juvenile record[,]' " it was "just as reasonable to construe [the] defendant's answer as a comprehensive denial of *ever* having engaged in criminal activity, which amounts to an outright lie." (Emphasis in original.) *Id.* at 591. Noting that great deference must be given to the trial court's interpretation of a defendant's testimony, the supreme court found no basis to disturb the court's conclusion that the defendant was attempting to mislead the jury. *Id.* at 590-91. Thus, it held that the court's decision to allow the State to impeach the defendant with his prior juvenile adjudications was not an abuse of discretion. *Id.* at 591.

¶ 48　In *Villa*, the defendant gave a statement to police about his involvement in the offenses at issue. *Villa*, 2011 IL 110777, ¶ 10. At trial, he testified that only part of the statement that he had given to police was true. *Id.* ¶ 12. When asked on direct examination why he would sign an inculpatory statement that contained false information, he stated that he " 'was scared,' " that he had " 'never been in a situation like this before,' " and that he had " 'never been in prison or nothing like that.' " *Id.* ¶ 13. On cross-examination, the State challenged the defendant's claim that he had " 'never been in a situation like this before,' " and the defendant admitted that he had previously been interviewed in another case by the same detectives and had given a typewritten

statement. *Id.* ¶ 14. The defendant insisted that the two situations were not alike and on redirect explained that in the prior case he was questioned as a juvenile whereas in the present case he was questioned as an adult after having been arrested and charged. *Id.* In rebuttal, the State published the defendant's juvenile adjudication for burglary and referred to it during closing argument as a basis for finding the defendant untruthful. *Id.* ¶ 15.

¶ 49    On appeal, the defendant challenged the admission of the juvenile adjudication. *Villa*, 403 Ill. App. 3d at 314. This court held that the juvenile adjudication was admissible for impeachment purposes under the relevant statutory provisions. *Id.* at 314-18. We went on to hold that, even if the evidence was inadmissible, the defendant opened the door to its use. *Id.* at 318.

¶ 50    The supreme court reversed. The court rejected the State's argument that the "defendant's testimony falsely implied that he had no experience with the criminal justice system," finding the State's interpretation of the testimony to be overly "broad" and unreasonable. *Id.* ¶ 50. The court stated:

> "When read in context, [the] defendant's testimony that he had 'never been in a situation like this before' plainly refers to his interrogation by [the detectives]. This testimony, at most, implied that defendant had never before been questioned by police. Police questioning may occur in numerous circumstances and is not necessarily indicative of a criminal background. Thus, [the] defendant's testimony simply opened the door to cross-examination by the State regarding instances of prior police questioning; it did not open the door to defendant's prior criminal history." *Id.*

The court noted that its result did not change when considering the defendant's additional comment that he had " 'never been in prison or nothing like that,' " because that portion of the testimony was truthful. *Id.* ¶ 52. The court stated that the defendant's testimony stood "in stark contrast" to

the testimony at issue in *Harris* where the defendant expressly stated: " 'I don't commit crimes.' " *Id.* ¶ 53. Accordingly, the court reversed our holding that the defendant's testimony provided an alternative basis for the admission of his prior juvenile adjudication. *Id.* ¶ 54.

¶ 51    Here, defense counsel advised the court that defendant would "testify to some essentially biographical data, how old he is, where he lives; he's married. That he served in the army in the 1990's for a couple years. Little bit about his employment history." Counsel advised that "[defendant] will deny he ever sexually abused [C.B.]" Counsel further advised that, in addition, he intended "on asking [defendant] why he told Detective Ives what the jurors saw in the video" and "[w]hy he told him that he sexually abused [C.B.] on nine or ten occasions." According to defense counsel, "[defendant] would testify that he was attempting to be agreeable with the police in that situation. He can't really explain or doesn't really know why he said what he said. Just that he was trying to be agreeable and or cooperative in that moment. That would be the substance of his testimony." Defendant claims on appeal that his "narrowly tailored testimony would have not misled the jury about his criminal background or the circumstances surrounding his inculpatory statement so as to open the door to bad acts."

¶ 52    Giving great deference to the trial court's interpretation of the proposed testimony, as we must, we find no abuse of discretion in its ruling that, if defendant so testified, the door would be open to the admission of the entire statement so as to show how the conversation began and to put the entire interview in context. See *Harris*, 231 Ill. 2d at 590 ("This court gives great deference to the trial court's interpretation of a witness's testimony.") Contrary to defendant's claim, his proposed testimony, *i.e.*, that he was "trying to be agreeable and cooperative," could have misled the jury. In its ruling, the court explained that the State would have the right to cross-examine defendant on whether he made his statements to the police "only because he was attempting to be

agreeable." As the court noted when standing by its ruling on reconsideration, "approximately 80 percent, if not more," of the interview had been edited out. The court properly determined that the State would have the right to show that defendant, far from admitting to the abuse of only one child just to placate the police, confessed to abusing multiple children. The State could ask the jury to consider whether a desire to be "agreeable" would, alone, motivate such an extensive confession. Thus, defendant's proposed explanation as to why he made the statements regarding C.B. opened the door to the evidence necessary to put defendant's statements in context and rebut that claim. We find no abuse of discretion.

¶ 53                    B. Propriety of the Trial Court's Refusal to Question a Juror

¶ 54    Defendant next argues that he was denied his right to a fair trial by an impartial jury, because the trial court refused to exercise its investigatory discretion to question juror No. 65 about whether he made the comment "he's guilty" on the first day of trial.

¶ 55    " '[A] trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations.' " *People v. Runge*, 234 Ill. 2d 68, 105 (2009) (quoting *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000)). "The trial judge's discretion clearly extends to the initial decision of whether to interrogate jurors." *Id.*; *Dominguez*, 226 F.3d at 1246.

¶ 56    Here, taking into consideration the totality of the circumstances surrounding the allegation of juror misconduct, we find no abuse of discretion in the trial court's refusal to conduct an inquiry. Indeed, as noted by the court, both the timing and the source of the allegation were questionable. The timing of the information was problematic, given that the court was not informed of the allegation until after the jury had already reached its verdict. Indeed, although David claimed to have realized, on the second day of the trial, that the individual who made the comment was a

juror, defense counsel was not informed of the alleged incident until the next day, after David and Mary had left the State and returned home. Equally problematic was the source of the information. David and Mary were relatives of defendant whose actions had already resulted in the discharge of a juror, after the juror reported that Mary had taken pictures of him and another juror during a break in the jury selection process. Their relationship to defendant and their prior actions certainly cast doubt on the veracity of their claim. Moreover, David was unavailable for questioning. Given the timing of the allegation, the relationship of the parties to defendant, their previous actions concerning the jury, and David's unavailability for questioning, we find no abuse of discretion in the trial court's refusal to question the juror.

¶ 57 The present case is readily distinguishable from *Runge*, the main case relied on by defendant, because in that case the allegations of juror misconduct were made by another juror, who was able to be questioned concerning those allegations in chambers by the trial court. *Runge*, 234 Ill. 2d at 109-119. Here, as noted, David was not available for questioning. In addition, his relationship to defendant, and his involvement in the discharge of another juror, cast doubt on his allegations. Those factors were not present in *Runge*.

¶ 58                                III. CONCLUSION

¶ 59 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 60 Affirmed.